**STATE of Maine**

v.

**Royal BURNHAM, Jr.**

Supreme Judicial Court of Maine.

Oct. 12, 1979.

John R. Atwood, Dist. Atty., Rockland, Charles K. Leadbetter (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Strout, Payson, Pellicani, Cloutier, Hokkanen & Strong by James W. Strong, Rockland, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK and ARCHIBALD, JJ., and DUFRESNE, A. R. J.

POMEROY, Justice.

This case requires us to address for the first time in Maine the issue of whether evidence of an abnormal condition of mind will be admissible to negate the existence of a culpable state of mind when the defendant is also claiming to be excused by reason of "insanity".[1]

---

1. Maine has gone from *M'Naghten* (established by court decision) *State v. Lawrence*, 57 Me. 574 (1870); *State v. Knight*, 95 Me. 467, 476, 50 A. 276 (1901), to *Durham* with modifications, *Durham v. United States*, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), by legislation, P.L.1963

Royal Burnham was convicted of a violation of 17–A M.R.S.A. § 208(1)(a)[2] (aggravated assault) despite his pleas of not guilty and not guilty by reason of insanity. Though 17–A M.R.S.A. § 59 makes provision for a bifurcated trial at the option of the accused, a unitary trial was chosen.[3]

This appeal seasonably followed the conviction.

Although the statement of issues is somewhat ambiguous, we discern three matters in this appeal which we must discuss and decide:

1.  Appellant's contention that the Superior Court Justice erred in refusing to instruct the jury that if the defendant introduces evidence sufficient to raise a reasonable doubt as to the criminal responsibility of the defendant because of his mental condition existing at the time of the commission of the acts, the State must disprove the existence of mental disease and defect beyond a reasonable doubt, citing 17–A M.R.S.A. § 5(2)(B);

2.  Appellant's contention that his constitutional rights were violated by his having been assigned the burden of proving by fair preponderance of the evidence that he lacked criminal responsibility as a result of a mental disease or defect; and

3.  Appellant's contention that the Superior Court Justice erred in refusing to instruct the jury that the crime of aggravated assault, (17–A M.R.S.A. § 208(1)(A)) is a crime which, by definition, requires the state of mind of "intentionally, knowingly, or recklessly" as a necessary element and that the existence of a reasonable doubt as to such culpable state of mind may be

Ch. 311 § 3, to legislation based on the A.L.I. formulated Model Penal Code, 17–A M.R.S.A. § 58, in its treatment of "insanity" as a defense to criminal conduct.

While we had many occasions to interpret Durham, State v. Hathaway, 161 Me. 255, 211 A.2d 558 (1965), State v. Durgin, Me., 311 A.2d 266 (1973), this is the first occasion we have had to interpret the most recent enactment of the Legislature on the subject.

established by evidence of an abnormal condition of mind. 17–A M.R.S.A. § 58(1–A).

We conclude there is little difficulty in disposing of the first two issues adversely to appellant's contention.

We sustain the appeal as to the third issue.

■ Concerning the first issue, we note 17–A M.R.S.A. § 5(2)(B) states:

2.  The State is not required to negate any facts expressly designated as a "defense," or any exception, exclusion, or authorization which is set out in the statute defining the crime,

    . . . :

    B.  By proof at trial, unless the existence of the defense, exception, exclusion or authorization is in issue as a result of evidence admitted at the trial which is sufficient to raise a reasonable doubt on the issue, in which case the State must disprove its existence beyond a reasonable doubt.

This section is not applicable to the defense of lack of criminal responsibility (insanity) as set out in 17–A M.R.S.A. § 58(1), (2) because of § 5(3) which states that:

3.  Where the statute explicitly designates a matter as an "affirmative defense," the matter so designated must be proved by the defendant by a preponderance of the evidence.

This section is applicable to the defense of insanity because of § 58(3), 17–A M.R.S.A. This section provides:

The defendant shall have the burden of proving, by a preponderance of the evidence, that he lacks criminal responsibility as described in subsection 1.

2.  Section 208(1)(A) in pertinent part provides:
    1. A person is guilty of aggravated assault if he intentionally, knowingly, or recklessly causes:
    A.  Serious bodily injury to another.

3.  Under 17–A M.R.S.A. § 59, defendant could have chosen a bifurcated trial in which the issue of guilt would have been tried in the first stage and the issue of insanity only if the jury returned a verdict of guilty in the first stage.

Although the drafters did not explicitly use the term "affirmative defense" in § 58, § 58(3) (quoted above) makes it clear that it was intended that the "insanity defense" continue to be an affirmative defense. The official 1975 "Comment" to § 58 notes that then existing Maine law placed the burden of proof on the defendant, *citing* 15 M.R. S.A. § 102, and *State v. Collins*, Me., 297 A.2d 620 (1972). Subsequent post-code decisions cited *infra* have affirmed that this is still the law in Maine.

■ As to issue no. 2, any question which may have existed has long since been resolved adversely to the position taken by the defendant. *State v. Buzynski*, Me., 330 A.2d 422, 431 (1974); *State v. Melvin*, Me., 341 A.2d 376, 379 (1975); *State v. Armstrong*, Me., 344 A.2d 42, 46 (1975). *State v. Tracy*, 372 A.2d 1048, 1049, n. 2 (1977). *See also Rivera v. Delaware*, 429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160 (1976), and the concurring opinion of Chief Justice Burger and Justice Rehnquist in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Any lingering doubts as to the constitutionality of Maine's allocation of the burden of proof were erased by *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

■ The State, relying on *State v. Thompson*, Me., 370 A.2d 650 (1977) and *State v. Thibodeau*, Me., 353 A.2d 595 (1976) argues that claimed error on the third issue has not been properly preserved under Rule 30(b), M.R.Crim.P.

We reject this contention.

The defendant timely submitted a request for jury instructions to the trial court. All of the requested instructions dealt either with the "insanity" defense or with the defendant's state of mind in connection with the requirement that the State prove beyond a reasonable doubt that the defendant possessed the requisite culpable state of mind at the time of the commission of the act in issue.[4] Requested instruction no. 2 was that the Court instruct the jury that: *"Evidence of an abnormal condition of mind may establish the existence of reasonable doubt as to the defendant's guilt."* This request tracks the language of 17-A M.R. S.A. § 58(1–A). Request no. 2 coupled with requested instruction no. 4[5] clearly raised the issue of the relationship between an abnormal condition of mind and the requirement that the State prove the existence of the culpable state of mind of "recklessness" beyond a reasonable doubt. No instruction specifically directed to this question was included in the charge. We think that on this ground alone error must be found preserved under this Court's decisions in *State v. Rice*, Me., 379 A.2d 140, 144 (1977), and *State v. Millett*, Me., 273 A.2d 504, 505–506 (1971). The defendant also, however, entered an objection at the close of the Court's instructions to the jury. The second portion of that objection paraphrased instruction no. 3 of the request submitted. Although both instruction no. 3 and the instruction requested at the close of the trial court's charge confuse the issues of culpable state of mind and the insanity defense (a confusion which we seek to unravel below), here, as in *State v. Thompson, supra:*

4. Defendant requested that the Court include the following instructions in its charge to the jury:
   1. An accused is not criminally responsible for his act, if at the time of the conduct, as a result of mental disease or defect, he either lacked substantial capacity to conform his conduct to the requirements of law, or lacked substantial capacity to appreciate the wrongfulness of his conduct.
   2. Evidence of an abnormal condition of mind may establish the existence of reasonable doubt as to the defendant's guilt.
   3. If the defense through its evidence has raised a reasonable doubt in your mind as

to the defendant's state of mind, the State must prove that the defendant did not suffer from an abnormal condition of the mind at the time of the conduct beyond a reasonable doubt.
   4. Unless you find beyond a reasonable doubt that Royal Burnham consciously disregarded a risk that his conduct would cause such a result you are directed to return a verdict of not guilty.

5. *See* n. 4, *supra.* Also see first clause of requested instruction no. 3, *id.*

The presiding Justice was fully aware of the defendant's requested instruction . . .. The defendant has complied with the underlying spirit of Rule 30(b) and has preserved his point for appellate review. (370 A.2d at 653).

We find the alleged error preserved with respect to failure to instruct the jury as to the requirement of 17–A M.R.S.A. § 5(1) (that each element of the crime must be proved beyond a reasonable doubt) and its relation to 17–A M.R.S.A. § 58(1–A).

In order to determine whether or not this failure constituted error in this case, we must examine and interpret the meaning of this section and its relation to the "insanity defense" in Maine's revised Criminal Code. We must reconcile the facial inconsistency between 17–A M.R.S.A. § 58(1–A) and 17–A M.R.S.A. § 59(2)(B).

Section 58(1–A) provides:

In a prosecution for a crime which may be committed intentionally, knowingly or recklessly, where such culpable state of mind is a necessary element, the existence of a reasonable doubt as to such state of mind may be established by evidence of an abnormal condition of mind.

As originally enacted, this subsection appeared at § 5(4) which read:

The existence of a reasonable doubt as to any intention, knowledge, or recklessness required as an element of a crime may be established by any relevant evidence including evidence of abnormal condition of mind or intoxication . . . [intoxication defined].

The "Comment" on that section stated:

Subsection 4 states that where the State must prove a culpable mental state as an element of the crime, *any evidence* which raises a reasonable doubt on whether the defendant had that mental state is admissible. [Emphasis added].

It is important to note that this subsection was then part of the section which set forth generally, in subsection (1), the requirement that each element of the crime must be proved beyond a reasonable doubt.[6] The "Comment" notes that this rule is compelled by the Federal Constitution. *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Before the code became effective, certain amendments were made including the moving of the substance of § 5(4) to § 58(1–A) and to § 58–A; thus splitting the references to abnormal condition of mind and intoxication and locating them in sections dealing with those subjects, rather than with the subject of proof beyond a reasonable doubt.

Subsections 1, 2 and 3 of § 58, 17–A M.R.S.A. deal with the affirmative defense of lack of criminal responsibility as a result of mental disease or defect. The definition of *"mental disease or defect"* in subsection 2 refers to that infirmity as an *"abnormal condition of mind . . ."*. The drafters apparently contemplated that in some cases evidence relevant to proof of the defense of *"mental disease or defect"*, as defined in § 58(2) would also be relevant to negate a culpable state of mind. However, they continued to adhere to the view that intent (*"culpable state of mind"*) and *"insanity"* are two separate concepts. The language from a Wisconsin case to that effect, *State v. Hebard*, 50 Wis.2d 408, 184 N.W.2d 156 (1970), was quoted approvingly in the 1975 *"Comment"* to § 59. This was the view in Maine prior to the adoption of the new Criminal Code as is made clear by the Court's opinion in *State v. Buzynski, supra* at 429. In that case the Court noted that: *"A person may well specifically intend to burn a structure, or to commit a robbery, even though he may suffer from a mental disease or defect which causes him to formulate such an intent."*

---

**6.** Section 5(1) M.R.S.A. provides in full:

1. No person may be convicted of a crime *unless each element of the crime is proved beyond a reasonable doubt.* "Element of the crime" means: The forbidden conduct; the attendant circumstances specified in the definition of the crime; *the intention, knowledge,* *recklessness or negligence as may be required;* and any required result. The existence of jurisdiction must also be proved beyond a reasonable doubt. Venue may be proved by a preponderance of the evidence. The court shall decide both jurisdiction and venue. [Emphasis added].

A problem arises only when the mental disease or defect, rather than *causing* the formation of a culpable state of mind, destroys the defendant's capacity to form the intention required for the crime. In such cases, psychiatric evidence relevant to the issue of *"insanity"* is also relevant to the question of whether the defendant is guilty of the crime, when the culpable state of mind ("intentionally", "knowingly", or "recklessly") is an element of the crime charged. The drafters recognized this overlap by their inclusion of § 58(1–A). As they note in the 1975 "Comment" to that section:

> In addition, even if the defense [of lack of criminal responsibility because of mental disease or defect] were abolished, it would still be necessary to admit psychological evidence that is relevant to the culpable state of mind which must be proved as one of the elements of the crime.

Thus it is clear that the drafters did not mean to deny the admissibility of relevant evidence bearing on the question of culpable state of mind, simply because that evidence is also relevant to the establishment of an insanity defense. This accords with the decision on admissibility made by the A.L.I. in the Model Penal Code on which the Maine Code is substantially based.[7] This conclusion as to the intention of the drafters is bolstered by the fact that in dealing with intoxication, the drafters provided that when the requisite culpable state of mind is "reckless", evidence of voluntary intoxication is not to be admitted on the question of culpable state.[8] Had the Legislature intended to except evidence of other abnormal conditions of mind from being admissible on the question of culpable state of mind it would have so stated.[9]

It did not do so.

The question remains, however, whether or not the provisions of § 59 in any way change this conclusion.

Section 59 is a procedural section which introduced the bifurcated trial into Maine practice. It provides that when a defendant chooses to enter both the pleas of "not guilty" and "not guilty by reason of insanity" he has an election between a bifurcated trial in which the issue of guilt will be tried first and the issue of insanity only if the jury returns a verdict of guilty—and a unitary trial in which both issues are submitted to the factfinder simultaneously. Initially, § 59 provided:

> 2. *If a two-stage trial is elected by the defendant,* there shall be a separation of the issue of guilt and insanity in the following manner.
>
> A. . . .
>
> B. Evidence of mental disease or defect, as defined in section 58, subsection 2, shall not be admissible in the guilt or innocence phase of the trial, but shall only be admissible in the 2nd phase following a verdict of guilty. [Emphasis added].

The apparent purpose of so providing was to "simplify the problem of trying the guilt issue by excluding evidence of insanity until after the defendant has been found tentatively guilty."[10] The "Comment" accompanying the section made clear that this sec-

---

7. *See* American Law Institute, Model Penal Code, Tentative Draft No. 1. Comments § 4.02, 193: "Some jurisdictions decline for reasons of policy to accord to evidence of mental disease or defect an admissibility co-extensive with its relevancy to prove or disprove a material state of mind. *See, e. g., Fisher v. United States*, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946). We see no justification for a limitation of this kind. If states of mind such as deliberation or premeditation are accorded legal significance, psychiatric evidence should be admissible when relevant to prove or disprove their existence to the same extent as any other relevant evidence."

8. *See* § 58–A(2), 17–A M.R.S.A.:

When recklessness establishes an element of offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he not been intoxicated, such unawareness is immaterial. This language was adopted by amendment in 1977 to replace the former subsection 2 which was to the same effect, but differed only in choice of words.

9. They certainly demonstrated that they knew how to do so when considering intoxication.

10. 17–A M.R.S.A. § 59, "Comment—1975".

tion, as it then appeared, precluded the introduction of evidence of mental disease or defect in the guilt phase of the trial *for the purpose of "rais[ing] a reasonable doubt concerning the mens rea element of the crime."* While this provision had the virtue of simplifying the evidence admitted in the first phase of a two-stage trial, it contradicted the provision of § 58(1–A) and raised some constitutional questions. In commenting on this section, a Maine Law Review Note observes:

> When the bifurcation procedure is elected by the defendant the question becomes: Does § 58(1–A) govern to admit evidence of mental disease or defect to negative certain mental elements in the guilt phase of trial, or does § 59(2)(B) govern to exclude such evidence from the guilt phase? Since the bifurcation procedure is elective it could be argued that the defendant waives his right to introduce defect evidence on the issue of guilt by choosing a two-stage trial. (*"Mens Rea and Insanity"*, 28 Me.L.Rev. 500, 518 n. 111 (1977).)

The holding of *In Re Winship, supra,* that the State must prove every element of a crime beyond a reasonable doubt raises a question about the constitutionality of preventing the defendant from introducing otherwise relevant evidence bearing on "culpable state of mind" in the guilt phase of the bifurcated trial. This question may or may not be resolved by the allowance of an election.[11] This question is not before the Court at this time, however, because in 1977, the Legislature amended § 59(2)(B). That section now reads:

Evidence of mental disease or defect, as defined in section 58, subsection 2, shall not be admissible in the guilt or innocence phase of the trial *for the purpose of establishing the defense of a lack of criminal responsibility*, as defined in section 58 subsection 1. Such evidence shall be admissible *for that purpose* only in the 2nd phase following a verdict of guilty. [Emphasis added].

█ Whether this change was made purely for policy purposes, because of constitutional concerns, or for other reasons does not appear in the legislative record, but the import of the language is clear: evidence of culpable state of mind as an element of the crime, *is* now admissible in the first phase of a bifurcated trial. Thus, though under the 1975 formulation there were doubts as to the applicability of § 58(1–A) in the guilt phase of a bifurcated trial, it is now clear that § 58(1–A) allows admission of *any* evidence, including evidence of mental abnormality,[12] which raises a reasonable doubt as to whether the defendant had the culpable mental state. This rule applies generally, whether or not the defense of lack of criminal responsibility as a result of mental disease or defect has been raised, and whether, if the defense has been raised, the trial is in one stage or two.

█ The effect of this provision at trial is that if the defendant wishes to introduce psychiatric testimony in the first or guilt phase of the bifurcated trial, or in a trial on the question of guilt or innocence alone where no plea of not guilty by reason of insanity has been entered, he should be

11. *See, e. g., State v. Shaw,* 106 Ariz. 103, 471 P.2d 715 (1970), striking down a non-elective two-trial statute.

12. The 1977 amendment puts Maine practice on the first phase of the bifurcated trial in accord with that of other states having bifurcated trial systems, *e. g.,* California, *see generally,* Louisell and Hazard, *Insanity as a Defense: the Bifurcated Trial,* 49 Calif.L.Rev. 805 (1961) and, in light of a very recent decision, Wisconsin, *Schimmel v. State,* 84 Wis.2d 287, 267 N.W.2d 271 (1978). *That case is of particular interest since the Maine bifurcated trial provisions are modelled on those of Wisconsin.*

*See* 17–A M.R.S.A. § 59 "Comment—1975". In *Schimmel,* the Supreme Court of Wisconsin, followed a decision of the Seventh Circuit in *Hughes v. Mathews,* 576 F.2d 1250, cert. dismissed 58 U.S. 94, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). The Wisconsin Court found unconstitutional the exclusion of psychiatric testimony, otherwise relevant and competent, from the first stage of a bifurcated trial. It overruled its previous decisions insofar as they were inconsistent with that holding. The affected cases, cited at 276, 267 N.W.2d 271, include *State v. Hebard, supra.*)

required to make an offer of proof out of the presence of the jury, so that the Court may ascertain that the proffered evidence goes to negate the "culpable state of mind" ("intentionally", "knowingly", or "recklessly") [13] which is an essential element of the crime. Only if the evidence is relevant to a culpable state of mind and otherwise comports with the rules of evidence must it be admitted, and the jury must be instructed as to its relevance in terms of § 58(1–A). It is important to note that not all evidence relevant to proof of the affirmative defense of lack of criminal responsibility would be relevant and admissible in the first phase of the trial.

█ In a unitary trial, such as the one under consideration on this appeal, where the pleas of not guilty and not guilty by reason of insanity are being tried simultaneously, all evidence of mental abnormality relevant to the affirmative defense necessarily comes in. In such a case, where any of this evidence in addition to bearing on the affirmative defense, also bears on the question of a reasonable doubt as to whether the defendant had the culpable mental state requisite to the crime,[14] the defendant is entitled to a jury instruction in terms of § 58(1–A). This instruction is particularly important in the unitary trial. Without it, the instructions on the affirmative defense of insanity may mislead the jury as to the prosecution's burden of proof on "culpable state of mind" when the evidence tending to negate "culpable state of mind" is the same evidence which goes to establish the "insanity defense".[15]

█ On this basis, the question becomes whether any of the evidence of abnormal condition of mind introduced in this case was relevant to the existence of the culpable state of mind, here recklessness, required for the commission of the crime of aggravated assault as charged.

At trial a large part of the testimony was directed to an attempt to reconstruct the defendant's mental condition at the time of the assault. The evidence established that on August 27, 1977, approximately two months before the assault of November 3, 1977, defendant was involved in a very serious automobile accident. Four other occu-

---

**13.** § 10, 17–A M.R.S.A. provides *inter alia*:

1. "Intentionally."

A. A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.

B. A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes that they exist.

2. "Knowingly."

A. A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.

B. A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist.

3. "Recklessly."

A. A person acts recklessly with respect to a result of his conduct when he consciously disregards a risk that his conduct will cause such a result.

B. A person acts recklessly with respect to attendant circumstances when he consciously disregards a risk that such circumstances exist.

C. For purposes of this subsection, the disregard of the risk, when viewed in light of the nature and purpose of the person's conduct and circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

**14.** *See* 17–A M.R.S.A. § 11(5).

**15.** In instructing the jury, the Court must ever be conscious that:

1. When "culpable state of mind" is required, it is an element of the crime;

2. The burden of proving all elements of the crime beyond a reasonable doubt is always on the State;

3. Lack of criminal responsibility (insanity) is an affirmative defense which the defendant has the burden of proving by a preponderance of the evidence.

Because this is so, it becomes particularly important that when instructing the jury respecting the prosecution's burden of proof, it be made abundantly clear that the prosecution must establish existence of a culpable state of mind beyond a reasonable doubt, and that the existence of a reasonable doubt as to such state of mind may be established by evidence of an abnormal condition of mind. 17–A M.R.S.A. § 58(1–A). The requirement of § 58(3) (defendant's burden of proof) has application only when the defendant has interposed "insanity" as an affirmative defense.

pants of the car were killed. Following the accident defendant was hospitalized with a head injury. Subsequently, following the incident which resulted in his being charged with assault, defendant underwent various psychiatric and neurological examinations. Defense counsel introduced lay witnesses who testified to defendant's complaints of headaches and inability to remember following the car accident. A State's witness also testified concerning the defendant's car accident, head injury and complaints of headaches and bad dreams.

The most significant testimony on defendant's mental condition came from the defendant's expert witness, Dr. Francis Kittredge, Chief of Neurology of Eastern Maine Medical Center, and from the State's expert rebuttal witness Dr. Ulrich Jacobsohn, a psychiatrist, Clinic Director of the Augusta Mental Health Institute. All of this testimony along with the testimony of non-medical witnesses was before the jury to determine whether defendant had made out his insanity defense. Certain of this testimony was also relevant to decide whether or not the defendant possessed the requisite intent. For example, since a "mental disease or defect" is by definition an "abnormal condition of mind," the evidence which shed light on whether defendant had a mental disease or defect was relevant. Doctor Kittredge described the results of two tests which were conducted on defendant, an electroencephalogram (EEG), and as a result of irregularities appearing in that test, a computerized axial tomography scan (C.A.T. scan).[16] The defendant also introduced into evidence photographs of the C.A.T. scan results. Doctor Kittredge testified that defendant's tests showed physical abnormality of the brain. This was corroborated by the State's witness, Doctor Jacobsohn. He testified that the C.A.T. scan "shows that Mr. Burnham does have some cerebral pathology."

Every physical abnormality does not, however, necessarily produce a functional, or behavioral abnormality rising to the level of a "mental disease or defect". Nor would it necessarily produce effects which negate the ability of a person to possess the requisite culpable mental state to commit certain crimes. Other testimony in the case as to how this functional abnormality affected or may have affected defendant's behavior was relevant to whether or not his conduct was "reckless" at the time of the assault.

On direct examination, Doctor Kittredge described the following as potential effects of the type of injury which the defendant had suffered:

Dr. Kittredge: . . . So you're talking about memory or in [sic] both events of recent [sic] and in the past. You're talking about emotional tone. In other words how do you respond to normal life situations . . . .. In the event that you have some disfunction in this area, it could be described by things like—confusion, memory problems, emotional instability, where someone who is not ordinarily upset by something is going to be either crying or laughing [in] inappropriate circumstances . . . ..

In this medial area and frontal temporal lobe, when there is damage it can be temporary or permanently [sic] damaged and can produce abnormal conduct and abnormal behavior. These are tragic circumstances particularly when the person doesn't improve and some can improve if it is a result of an accident such as an auto accident.

Again, the symtoms [sic], like irritability, memory loss, dizziness, difficulty with sleep, hunger, insomnia, responds inappropriately—We see these things and in most instances most of them will subside . . . ..

Q. Doctor, is the symtomology [sic] that was given to you by Royal, which you learned from other areas of your history, consistent with the type of injury you've described?
A. Yes, it is consistent with posttraumatic head injury syndrome or . . a brain injury.

16. A C.A.T. scan, according to the testimony of Doctor Kittredge, uses X-rays and a computer to reconstruct on a T.V. screen the structural anatomy of the organ scanned.

Q. Giving a hypothetical—a person strikes or physically attacks another person, is that action consistent with the symtomology [sic] with the type of defect or injury Royal Burnham has?

A. Well, inappropriate responses, where someone would get angry for—without appropriate provocation and gets in a fight or strikes someone, this does occur in patients who have symptoms [sic] described by Mr. Burnham and in patients who have areas of brain damage.

On cross-examination, Doctor Kittredge addressed the condition of the defendant following the accident more directly and the reports on which he relied in examining the defendant:

Dr. Kittredge: Yes, I did take it [Dr. Jacobsohn's notes of March, 1978] into consideration in forming my own opinion and in reading his opinion I was looking specifically for certain kinds of things which was not provided by Mr. Burnham, and they were present in the notes of Doctor Jacobsohn and they were one of the other reasons including what Mr. Strong had told me about the night before the incident that Mr. Burnham had called another attorney that was representing him, I think, in a civil action or something of that nature and told him that he felt very bad and very frightened and that he was going to hurt somebody and wanted his help and wanted him to do something. I don't know what happened as a result of that conversation but that was part of what was told to me before I saw Mr. Burnham. Doctor Jacobsohn's notes elicited information I assume from Mr. Burnham in regards to the fact he had been unconcious [sic] for a day and a half and following it suffered headaches, loss of feeling of the fingers, he also felt following the accident he had intense feelings of hatred, that people he had previously just disliked—He had headaches in the early part of December which was consistent with the history I got, he also told Doctor Jacobsohn he had no memory of assaulting the child. This was consistent with the history given to me by Mr. Burnham and in terms of his behavior at that time and the emotional state it was consistent with what I had from other sources. . . .

Q. Did you make any effort to determine—the truthfulness of the statement given to you by Royal Burnham as you obtained a history from him?

A. Well, as I said, the information provided me by Mr. Strong and the notes I later reviewed, including those from Doctor Jacobsohn and the story that Mr. Burnham himself told me were consistent with the kind of head injury that he had. I would say, that for someone to walk in and invent that story would be extremely difficult unless he had gone out and read a text book of injuries and found out what he should say.

Q. You believe he was unconcious [sic] for a day and a half after the accident?

A. No, sir, I don't believe that, I believe he had amnesia for that period since he said that and also told Doctor Jacobsohn that he wasn't aware of being concious. [sic] Being aware and being conscious are two different things . . . . .

A. . . . His head was injured—his memory was impaired so that for a day and a half he was not aware that he was awake and saying anything. He said that in his own history and from what I've seen of Doctor Jacobsohn's report he said the same thing. That doesn't change the fact that he thinks he was unconscious, he doesn't remember the circumstances of that day and a half and that is consistent with the remainder of the history that he gave me.

Finally, the testimony of Doctor Jacobsohn on cross-examination to some extent corroborates and elaborates on this testimony with respect to what the defendant's mental condition may have been at the time of the alleged assault:

Q. Isn't a symtom [sic] of posttraumatic syndrome, explosive rage?

A. Yes, it is.

Q. Isn't it true, that many brain damaged individuals feel the frustration and anger of others?

A. That is frequently true.

Q. You have testified that you have no reason to contradict Doctor Kittredge's testimony that, Royal does suffer from brain damage?

A. I have no reason to quarrel with that.

Q. This explosive rage often results from disorderly limbic system, is that correct?

A. That is in seizure disorders.

Q. Could you tell us what neocortex and limbic system is?

A. The neocortex is in the inner part of the brain. Based on the evolution of the animal kingdom—if I'm in the Courtroom I'd better be careful talking about the Darwin Theory. The higher brain centers are referred to as the neocortex, the most recently acquired and they perform the higher functions. The more primitive functions . . . are . . . feeling and emotion.

Q. Doctor, if I was to tell you which part of the brain controlled decision on my part to initiate premeditated assault on someone, would that be the neocortex.

A. Well, if you speak of cold detachment in a person, that would be the neocortex, yes.

Q. If I acted impulsively with rage, without premeditation, the cause would be from the limbic or older area of the brain?

A. That is the theory, yes.

A. And consistant [sic] with that theory, damage to the limbic system?

A. There may be but that is not alway [sic] a cause and effect . . . ..

Q. In the most severe accident cases there is quite often personality disorders?

A. In severe cases.

Q. Is this area—the temporal area, particularly vunerable [sic] to severe closed head injuries.

A. It tends to be because of its location, yes.

Q. You were aware that Royal was admitted to the Institution in Augusta on Court Order and by a motion by the Defendant that he be sent there?

A. Yes.

Q. And you're also aware that preliminary reports, again on Defendant's request he was evaluated locally by Doctor Sacks?

A. That is correct.

Q. Are you aware that Doctor Sacks gave a report which stated that Royal Burnham may have been out of contact at the time of the offense and a neurological examination and opinion would be necessary due to brain trauma resulting from the accident rather than being due to psychological causes?

A. That is correct.

There was other testimony, primarily by Doctor Jacobsohn, which tended to refute the hypothesis that the brain damage was in any way responsible for the defendant's behavior on the day of the alleged assault. Nevertheless, on the basis of the quoted testimony, we must say that there was testimony on the record relevant to the question of whether the defendant had an abnormal condition of mind which might have created a reasonable doubt as to whether he possessed the requisite culpable state of mind to commit the crime of assault. When such evidence exists, it is incumbent on the Court to give an instruction in the terms of § 58(1–A).

The failure to give such instruction is error of constitutional dimensions under *Winship, supra.* Because defendant also raised the affirmative defense of lack of criminal responsibility and this was a unitary trial, the defendant suffered special prejudice; the jury may have been misled into believing the State was not required to prove the existence of a culpable state of mind beyond a reasonable doubt.

For this reason we must and do sustain the appeal.

The entry is:

Appeal sustained.

Judgment of the Superior Court vacated.

Remanded for further proceedings consistent with this opinion.

DELAHANTY, GODFREY and NICHOLS, JJ., did not sit.

DUFRESNE, A. R. J., sat by assignment.