STATE OF MAINE
*vs.*
ANTONY CASALE

Cumberland.    Opinion, November 21, 1952.

*Daniel C. McDonald and William H. Niehoff,* for State.

*Walter M. Tapley,*
*Benjamin F. Chesley of Massachusetts Bar,*
*James Morelli of Massachusetts Bar,* for respondent.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

FELLOWS, J.    This was an indictment found by the Grand Jury of the Superior Court for Cumberland County under the provisions of Revised Statutes 1944, Chapter 121, Section 20, against Anthony Casale for transporting a female person within the state for purposes of prostitution.    The indictment was tried at the January term of the Cumberland County Superior Court, and the verdict was guilty. The case now comes to the Law Court on exceptions to the admission of certain testimony; exceptions to the denial of motion for directed verdict, and exceptions to the denial of motion in arrest of judgment.    In addition to the foregoing exceptions printed as one volume, there was a motion filed on April 14, 1952 for a new trial on the ground of newly discovered evidence, and the evidence in support was taken out before the Justice of the Superior Court at Portland on April 28, 1952 (Revised Statutes 1944, Chapter 94, Section 15), and this motion for a new trial with the evidence, is a part of this record in a separate volume.

The evidence taken at the trial shows that on January 4, 1951 one Anthony Bruni of Portland, who was acquainted with a girl known to him as Marilyn Sargent, took her in his automobile from the bus station in Portland to "right across from Hay's drugstore" where he introduced her to

the respondent Tony Casale. Bruni told Casale that he (Casale) "could get her a job somewheres as a waitress or something." Bruni then left her with Casale and drove away.

Marilyn Sargent, nineteen years old, testified that she talked with the respondent, Casale, and told him she was experienced in housework and waitress work and wanted a job. Casale said he knew of a job that he could get for her, and she went with him in his automobile from Portland to "Melody Ranch" in Old Orchard, carried on by one Lillian Levesque. "Q. What happened when you arrived there with Mr. Casale in the station wagon? A. Mr. Casale started to get out of the beach wagon, and then he turned around and said to me 'Oh, by the way, this is a cat house,' and I said, 'I don't understand. I don't know what you mean,' and he says, 'This is a house of prostitution,' and I said, 'Well, I don't want anything to do with it.' I said, 'After all I didn't come out here for that kind of a job and I want you to take me back to Portland,' and he said 'No.' He wanted me to come into the house because he wanted to speak with Lillian, and he informed me that I was going into the house, and I went." * * * "Q. Now what happened when you got in there? A. He rang the door bell and Lillian met us at the door, and Lillian took me into the living room. She went back out into the kitchen and conversed with Tony Casale for a few minutes. Then she came into the living room and sat down and started to talk to me. Q. Was the door open? A. Yes. Q. Was he close enough so he could hear the conversation? A. Yes. Q. What conversation was had there with Lillian? * * * (Objection) (Admitted). A. She asked me my name and I told her. She asked me how old I was and I told her, and then I asked her if I was going to be allowed to go back to Portland. She didn't answer my question, and I asked her if I could believe Tony Casale when he said that this was a house of illfame,

and she said 'Yes,' and I informed her that I wanted to go back to Portland, and if I was not allowed to go back to Portland that something would be done about it. Then she got very nasty with me, and told me I wouldn't be allowed to go back to Portland. In the meanwhile Tony Casale went out the door."

Miss Sargent further testified that when Casale had gone, she tried to leave the Levesque house, but the doors had been locked, her hands were twisted by Lillian Levesque, she was taken and locked into an upstairs room, and she was obliged to stay and submit to prostitution for a period of approximately ten days. She had thirty men visit her at $10.00 each, and she was paid half of her earnings by Lillian Levesque. On arriving at Portland after being permitted to leave Old Orchard, she met her "boy friend" Donald Morris, and told him what had happened. She married Morris on January 30, 1951, and she went to the police with her complaint sometime after her marriage.

The respondent did not testify and no evidence was introduced by him. The respondent rested his case at the close of the State's evidence.

## EXCEPTIONS

FIRST EXCEPTION: The attorney for the respondent objected to the admission of the testimony (quoted above) regarding the conversation between Marilyn Sargent and Lillian Levesque, on the ground that it was not in the presence or hearing of the respondent. The two women were in the living room and it was admitted that the respondent was approximately 28 feet away, and in the kitchen. Marilyn Sargent testified she could see the respondent in the kitchen near the sink, and that he could hear what was said. The kitchen and living room were separated only by a "very small room," with all doors open from living room to

kitchen. The conversation between the women was "in a regular tone of voice until I got angry and then I believe I raised my voice quite highly." The presiding justice admitted the conversation for consideration by the jury, subject to respondent's objection and exception.

It has always been the rule that relevant statements made in the presence and hearing of the accused are admissible. It must appear to the justice presiding, in the first instance, that the respondent either heard what was said or was in a position to hear, so that he could have explained, denied, or otherwise contradicted if he had so desired.

Whether or not, under all the circumstances, testimony may be given regarding statements made in the presence of the accused, is a matter of sound judicial discretion. What the facts were is a question for the jury, and the jury must pass upon whether the respondent actually heard, and whether he should have spoken or kept silent, or whether he was in a situation where not at liberty to reply. This rule is fully discussed in 16 Corpus Juris, "Criminal Law," 631, Sections 1256-1262, citing Maine and Massachusetts cases. See also *Blanchard* v. *Hodgkins,* 62 Me. 119; *State* v. *Reed,* 62 Me. 129, 141; *Keeling Easter Co.* v. *Dunning,* 113 Me. 34, 37; *Thayer* v. *Usher,* 98 Me. 468; *Gerulis* v. *Viens,* 130 Me. 378, 381. We see nothing in the record to indicate that the presiding justice used other than proper discretion in permitting the witness to testify regarding the claimed conversation. This exception is overruled.

SECOND EXCEPTION: This exception was taken to the denial of respondent's motion for a directed verdict. There are probably only the two persons in the beach wagon who know the material and important facts with regard to the ride given by the respondent to Marilyn Sargent from Portland into York County, and whether she was enticed to ride by the prospect of lawful employment as a waitress or

housekeeper held out to her by the respondent. Did he transport with intent to "induce, entice?" She so testified. Her testimony, if true, contains all the elements necessary to convict the respondent within the terms of the statute. The jury saw her and heard her testify. The jury believed her story relative to the transportation and the purpose.

The statute (Revised Statutes 1944, Chapter 121, Section 20) provides as follows: "Whoever knowingly transports or causes to be transported, or aids or assists in obtaining transportation for, by any means of conveyance into, through, or across the state, any female person for the purpose of prostitution or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such female person to become a prostitute shall be punished." * * * "Such person may be prosecuted, indicted, tried, and convicted in any county in or through which he shall have transported or attempted to transport any female person as aforesaid."

The foregoing statute was passed by the legislature for the purpose of prohibiting commercialized vice. *State* v. *Day,* 132 Me. 38. Similar statutes are in force in many other states. See 73 *Corpus Juris Secundum* "Prostitution," 233, Section 7-C and cases construing similar statutes.

Here the respondent is charged "did knowingly transport by means of a conveyance, to wit: a beach wagon automobile, through and across the State of Maine, to wit: from Portland, through South Portland, Scarborough, in and through the County of Cumberland and into York County, a female person, to wit: Marilyn Sargent, with intent and purpose to induce and entice said female person to become a prostitute." The State's evidence, if believed, and if it convinces beyond a reasonable doubt (with the inferences that may properly be drawn from it) would authorize a jury to convict. *State* v. *Bobb,* 138 Me. 242. The jury could find

that the elements necessary to make out the offense created by the statute are present. It could find that the respondent acted "knowingly," and that he "transported" a "female person through and across the State of Maine" with "intent and purpose, to induce and entice" her to become a prostitute as alleged in the indictment. "The purpose in transporting determines the guilt regardless of whether that purpose be consummated." See *Commonwealth* v. *Neely*, (Penna.), 10 Atl. (2nd) 925 construing a like statute.

The respondent did not offer to testify as was his right and privilege, and the fact that he did not testify is not evidence of his guilt. R. S., 1944, Chap. 135, Sec. 22.

It is when the State's evidence is so weak or defective that a verdict of guilty cannot be sustained, that the court should direct an acquittal. *State* v. *Cady*, 82 Me. 426; *State* v. *Bartley*, 105 Me. 505; *State* v. *Grondin*, 113 Me. 479; *State* v. *Keating*, 123 Me. 561.

This case before us is not one where the verdict should have been directed. The presiding justice was correct in submitting the facts to the jury. The second exception must be overruled.

THIRD EXCEPTION: This exception was to the denial of respondent's motion in arrest of judgment on the ground, as stated in respondent's brief, that "the germane portion of the statute which is concerned in the motion in arrest of judgment is 'into, through, or across the state.' " The indictment alleges "through and across the State of Maine, to wit, from Portland, through South Portland, Scarborough, in and through the County of Cumberland and into York County." The respondent says the indictment is not exact enough, it is wanting in preciseness, and it would not prevent subsequent criminal action. The respondent cites *State* v. *Peterson*, 136 Me. 165 and *State* v. *Lashus*, 79 Me. 541.

The case of *State* v. *Peterson,* 136 Me. 165 was where the complaint for driving under the influence of intoxicating liquor stated only that the respondent "operated a motor vehicle over and on Route 3 in Gray while he was then and there under the influence of intoxicating liquor." The court held the complaint invalid because "Route 3" might have a different meaning than "way" under certain circumstances. "It is wanting in preciseness."

The case of *State* v. *Lashus,* 79 Me. 541, cited by respondent was a complaint that alleged that respondent did "transport from place to place in said State of Maine intoxicating liquors." The court held that the complaint was invalid because no place in Maine was designated. "Had the allegations limited the places * * * the complaint might have been sufficient."

In the case at bar places are limited, to wit, Portland, South Portland and Scarborough in Cumberland County. No particular city or town in York County is alleged, but the evidence admitted without objection, shows that it was Old Orchard. The words "into York County" might well be considered surplusage because not necessary to commit the offense. The offense consists of any transportation, whatever the distance, anywhere in Maine, and the accused may be prosecuted in any county "in or through which he shall have transported or attempted to transport." R. S., 1944, Chap. 121, Sec. 20; *Commonwealth* v. *Neely,* (Penna.), 10 Atl. (2nd) 925. The presiding justice was correct in overruling the motion in arrest of judgment because places are designated in Cumberland County where the indictment was found. The exception to denial of motion in arrest of judgment is overruled.

## MOTION FOR NEW TRIAL

The tests to be applied to this motion for a new trial, on the ground of newly discovered evidence, are (1) that the

evidence is such as will probably change the result if a new trial is granted, (2) that it has been discovered since the trial, (3) that it could not have been discovered before the trial by the exercise of due diligence, (4) that it is material to the issue, and (5) that it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict. *State* v. *Irons*, 137 Me. 294; *London* v. *Smart*, 127 Me. 377.

The testimony was taken on April 28, 1952 before a justice of the Superior Court, to support this motion. R. S., 1944, Chap. 94, Sec. 15. The conviction by the Cumberland County jury was at the preceding January term. The respondent produced eight witnesses to show the claimed evidence as newly discovered, and in addition he offered his own testimony which he did not offer at the trial.

Ivory H. Fenderson of Saco, a contractor, stated that he gravelled the Levesque yard in February 1951, and took a girl known to him as Linda Lynn from Portland to Melody Ranch.

Morris Silverman said that he knew Marilyn Sargent as Linda Lynn and he saw her at Melody Ranch early in 1951 and took her to Graymore Hotel. Later he saw her at Melody Ranch again and she made no complaints that she was a prisoner there. He bought a ticket for her to Stamford, Connecticut and he sent money to her to come back. Octave Boucher worked at the Ranch in January 1951 and knew the Sargent girl as Lynn; that during the time she said she was a prisoner she told him she had been to the movies.

Elmer Jordan took care of horses, and said that Marilyn Sargent had free run of the place and looked "happy and pleasant."

David McCallum, an Assessor of Old Orchard, went to Melody Ranch and sat at table with Marilyn Sargent and Miss Levesque and once he saw Marilyn in a taxicab.

Stephen O'Donnell of Rogers Jewelry Store in Portland, identified an account from his store bearing Marilyn Sargent's signature when she purchased a string of pearls on January 8, 1951.

Lillian Levesque testified she knew Marilyn as Linda Lynn; that Marilyn had been at Melody Ranch several times; that she took Marilyn to Portland several times to shop and once Marilyn bought a necklace; that she (Lillian Levesque) was in New Hampshire when Casale case was tried; that she never held Marilyn a prisoner; that Marilyn stole some of her clothes and demanded money of her with threats; that she (Lillian Levesque) was convicted in York County in January for running the house of ill fame.

Tony Bruni identified Marilyn Sargent as a girl he met on Congress Street in Portland some time after he had introduced her to respondent in January 1951. At her request he took her to Melody Ranch, but the place was closed and he brought her back.

Morris Silverman, David McCallum, Elmer Jordan and Octave Boucher identified Marilyn Sargent as the same person they referred to in their testimony.

Marilyn Sargent (now Marilyn Sargent Morris) was called and testified regarding her marriage on January 30, 1951; that she knew who Bruni and Silverman were but did not know Boucher, Jordan or McCallum, and that she is the same person who was at Melody Ranch.

The respondent Anthony Casale, testified that he did not know Marilyn Sargent was going to testify as she did at his trial; that he was being persecuted; that he had known Lil-

lian Levesque well for twenty years; that he was introduced to Marilyn by Anthony Bruni; that he went to Florida with Lillian Levesque on a trip, after the State's investigation of this case started, but Melody Ranch was closed when they got back; that this accusation against him is a "shakedown" to possibly obtain from him $2,000 to stop proceedings; that he did not think it necessary to get Lillian Levesque to testify at his trial; that he made no attempt to obtain any witnesses for his trial, because "I didn't bother about it. It was none of my business. I thought maybe the State would not prosecute."

The foregoing evidence to support the motion for new trial as being newly discovered, does not in any manner deny the charge in the indictment. Much if not all of the evidence would be admissible only within the discretion of a presiding justice. The evidence was known to the respondent before the trial, or could have been found by the exercise of reasonable diligence. The respondent said "I didn't bother about it." That some of this evidence was known, is shown by the cross examination of State's witnesses. The evidence that was known was not used, as no evidence was introduced in defense. Whether Marilyn Sargent (Morris) was made a prisoner for ten days, or went and stayed at the Ranch willingly, is not the question. The testimony is not material to the issue, as the real issue was and is the transportation and the respondent's purpose. All the evidence offered on this motion for new trial is an attempt to impeach the testimony of Marilyn Sargent as false, by showing that she was not a prisoner and remained willingly, and that she had perhaps been at the Ranch previously. This evidence presented to support the respondent's motion does not stand the legal tests applicable, and a study of all the evidence does not convince the court that, on a new trial, the result would probably be changed. *Boisvert* v. *Charest*, 135 Me. 220; *State* v. *Irons*, 137 Me. 294; *State* v. *Shea*, 132 Me. 16.

The record of this case and the record in support of the motion for new trial, however, does show clearly (1) that no injustice was done at the trial, and no injustice will be done by denial of the motion for new trial, and (2) that the capable attorneys for the respondent were untiring and thorough in their efforts to protect every legal right of the respondent.

*Exceptions overruled.*

*Motion overruled.*