STATE OF DELAWARE v. EDWARD D. BITER and BITER'S AUTO SERVICE, INC., a corporation of the State of Delaware.

(*December* 28, 1955.)

LAYTON, J., sitting.

*Herbert L. Cobin,* Chief Deputy Attorney-General, for the State.

*David B. Coxe, Jr.,* for the Defendants.

Superior Court for Kent County, Nos. 14 and 15, February Term, 1955.

LAYTON, J.:

Three reasons are set forth in support of granting one or both motions. The first is that the verdict was the result of pre-

judice. The second that, since the evidence was entirely circumstantial, and as consistent with defendant's innocence as guilt, the motion for acquittal must be granted. And, finally, the important assignment of error is that there was not sufficient evidence to support a conviction.

As to the first reason, it must be conceded that a great deal of notoriety was attached to the case. However, if defendants thought their positions were prejudiced thereby, they could have petitioned for a change of venue[3] under Rule 21(a) of the Criminal Rules of this Court, *Del. C. Ann.* This was not done. Moreover, at the request of defendants' counsel, I specially charged the jury, in effect, that in view of the notoriety surrounding the case, its duty and responsibility was to disregard completely anything it had read or heard about the affair and decide the facts upon the evidence heard from the witness stand. Under the circumstances, I am not persuaded that defendants' first contention has merit.

Next, there is the point about circumstantial evidence. The difficulty with the argument is that it is not applicable. It is the law of this State that where the evidence is wholly circumstantial, the jury must be fully satisfied not only that the circumstances are consistent with the accused having committed the act but also that the facts shown by such evidence are such as to be inconsistent with any other rational conclusion than that of guilt. *Holland v. State,* 9 *Terry* 559, 107 *A.* 2d 920. But the evidence here was not wholly circumstantial.[4] There was direct evidence of a substantial nature, which, if believed, and weighed in connection with other circumstantial evidence,

---

[3]"For Prejudice in the County. The court upon motion of the defendant shall transfer the proceeding as to him to another county if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

[4]"This rule, however, [the circumstantial evidence rule here under consideration] applies only where the prosecution relies entirely on circumstantial evidence * * * ." 23 *C. J. S.,* Criminal Law, § 907, p. 151.

pointed strongly to guilt. Defendants' second contention is dismissed.

Before examining the record at length insofar as it bears on the remaining charges, applicable principles of law should be considered. The bulk of the charges are based upon a conspiracy which, in *State v. Cole, Gen. Sess. Del.,* 1 *W. W. Harr.* 279, 114 *A.* 201, was defined as follows:

"A conspiracy is the combination of two or more persons to do either an unlawful act or a lawful act by criminal or unlawful means with unity of design and purpose. The gist of the offense is the unlawful combination between the parties. *No formal agreement between the parties to the conspiracy charged is necessary. It is sufficient that the minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts and commit the offense charged.* Conspiracy implies concert of design and not participation in every detail necessary to carry the general purpose or design into execution. Though the common design is the essence of the charge, it is not necessary to prove that the accused came together and actually agreed in terms to have that design and to pursue it by common means. If it be proved that the accused pursued, by their acts, the same object, often by the same means, *one performing one part and another another part of the same, so as to complete it, with a view to the attainment of the same object,* the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object.

"A conspiracy may be shown either by direct evidence, that is, by the admissions and declarations of the parties or co-conspirators, or by circumstantial evidence; that is, by facts and circumstances from which the existence of the conspiracy may be inferred. Proof of a conspiracy will generally, from the nature of the case, be circumstantial. * * *" (Emphasis supplied.) 114 *A.* 204.

"In order to constitute a conspiracy there must be a combination to do an unlawful act by at least two persons in fur-

therance of a common design, that is, the same design or purpose must be in the minds of at least two conspirators. A common design is the essence of the charge. A conspiracy may be formed and a party not be in it at the time of its formation, *but may afterwards come in and be connected with the conspiracy, and in such case he is as guilty as he would be if he were in the first stage thereof,* for he is deemed in law a party to all acts done by any other parties, either before or after, in furtherance of the common design.

"While it is necessary for the state to show that the defendants had guilty knowledge, it is not required to show that guilty knowledge was imparted to all defendants at one and the same time, or by one and the same means. It is sufficient to show that each of the conspirators had guilty knowledge. *If a person, understanding the unlawful character of a transaction, assists in the prosecution thereof in any manner with a view to forwarding the common purpose or scheme, he becomes a conspirator.* And while a combination or agreement to do an unlawful act must be shown, it is not necessary that the act should be actually done, or if done that a party to the agreement profited thereby." (Emphasis supplied.) 114 *A.* 205.

A motion for acquittal under Rule 29 of the Criminal Rules[5] is tantamount to the former motion for directed verdict with the added proviso that the Court may, in its discretion, reserve decision upon the motion until after the verdict of the jury. Familiar as such a motion has been in the practice of this jurisdiction, it has been the subject of little or no comment. It is appropriate, therefore, to state that a motion for acquittal (directed verdict) is a motion to take the case from the jury. In criminal causes it is available to the defendant only. It denies the sufficiency of the evidence and challenges the State's right to go to the jury. In passing upon such a motion, the evidence, together with all legitimate inferences therefrom, must

[5]Identical with Rule 29 of the Federal Rules of Criminal Procedure, 18 *U. S. C. A.*

be considered from the point of view most favorable to the State. The Court is without power to determine the weight of the evidence or where the preponderance lies. 88 *C. J. S.*, Trial, § 255 *et seq*. It is only where the State has offered insufficient evidence to sustain a verdict of guilt that the motion will be granted. *State v. Casale*, 148 *Me*. 312, 92 *A*. 2d 718.

In a criminal case, a motion for new trial lies after a verdict unfavorable to the defendant. In this State, unlike many jurisdictions, such a motion has been narrowly construed and will not be granted if there was some probative evidence upon which a verdict of guilty could reasonably be based. *D'Amico v. State*, 6 *Boyce* 598, 102 *A*. 78; *State v. Thomas*, 6 *Terry* 385, 75 *A*. 2d 218.[6] However, in 1953, our Rules of Criminal Procedure were adopted. Rule 33, applicable to motions for new trial, is the same as the Federal Rule and reads:

"The court may grant a new trial to a defendant if required in the interest of justice."

Whether the quoted Rule has entirely supplanted, or to some extent modified, the long settled rule of the *D'Amico* and *Thomas* decisions, has never been decided. In *State v. Tribuani*, No. 20, January Term, 1955, May 13, 1955 (unreported), I considered the Rule and several Federal cases bearing upon it but declined to pass upon it, except to the extent of observing that "* * * sufficient appears to indicate an intention on the part of the framers (of the Rule) to modify, at least to some extent, the inflexible rule of *D'Amico v. State* and *State v. Thomas*."

Assuming, without deciding, that Rule 33 may be construed as some modification of the rationale of *D'Amico v. State*, we can now proceed to an analysis of the evidence in the light of the legal principles above discussed. At the outset, it may be said that even a cursory review of the record points unerringly to the

---

[6]In many jurisdictions, including the Federal Courts, it has been frequently stated that a motion for new trial would not be granted if there is substantial evidence in support of the verdict. *U. S. v. Haynes*, D. C. 81 *F. Supp.* 63, affirmed 3 *Cir.*, 173 *F*. 2d 223.

fact that some individual or individuals connected with Biter's perpetrated a fraud upon Villa. The clear evidence is that Lt. Jensby first bought a new Mercury automobile from Biter's. He drove it about 800 miles, by which time he had decided he was not altogether satisfied with it. Moreover, he had had a slight accident damaging the fender. A second-hand Lincoln was available and Biter's took back the Mercury in trade for the Lincoln. Just prior to this trade, Lt. Villa had talked with Murphy about trading in his Ford for a new Mercury of much the same type and color scheme as the Jensby Mercury which, by then, was available for sale as a used car. The sale of new Mercury cars was very slow due to a strike. Durney, in charge of sales for Biter's, was unable to get promise of delivery of a new Mercury to suit Villa's specifications. Murphy asked Durney what was to be done with the Jensby Mercury. He was told by Durney that it would be sold as a new car with a new car guarantee. Murphy then telephoned Villa that a person who had previously ordered a new Mercury approximating his specifications had canceled his order; that the new car was due in at any time and did he want it. This story was Murphy's own fabrication. Villa did want it. Now, Murphy was talking about the Jensby machine. At this time, then, it is clear beyond doubt that a fraud was being perpetrated upon Villa by the misrepresentations made by Murphy and that other employees of Biter's were part and parcel of it.

Then follow two significant bits of circumstantial evidence. Jensby had arranged through his insurance company to have the slight fender damage to his Mercury repaired at Ellis-Nash. When the Villa deal became active, Durney notified Jensby that they (Biter's) would take care of the fender damage. Ellis-Nash was upset about this but unable to prevent it. The Mercury was then taken to a repair shop selected by Durney. This shop did all of Biter's repair work. When the job was done, the bill was rendered over Biter's name to Jensby's insurance company. The only reasonable inference from these facts is that Biter's, having decided to sell the second-hand Mercury as new, did not want it to be repaired at the shop of a rival from which it might even-

tually "leak out" to the new purchaser that he had in reality purchased a damaged, second-hand car. Significant, also, was the fact that after the Mercury in question left Jensby's control, the speedometer was set back. This speedometer did not jump back from 800 miles to 8 miles of its own accord. It was obviously set back by an official of Biter's or by his direction.

Thus, Villa bought the car, paying a new car price for it, and the fraud was consummated. But Biter argues that, conceding the clear evidence that some one or more persons connected with his agency committed this fraud, there is no proof that he himself had any connection with it. To the contrary, the testimony, both circumstantial and direct, strongly belies this argument. Let us analyze it.

From the evidence in this connection, the jury could well have concluded the following facts. Biter knew all the details of the original sale to Jensby and of the return of the Mercury in trade for a Lincoln. The sale of new Mercury cars was slow. During the period covered by this transaction, there were only five new Mercury cars in Biter's for sale and only twenty-two used cars. A jury could well infer from this that Biter's was a small concern and that an active head such as Biter would keep all its day-by-day transactions at his finger tips. From a sales board or chart maintained in his agency, Biter knew the status of the used Jensby machine had changed to that of a new car. He knew Villa thought he was purchasing a new car. On the day of the actual transaction, he sat down at a table with Murphy and Villa. A number of papers were given to him. One was the original purchase order for a new Mercury, signed by Villa some days before. The word "new", describing the car, was checked off by an ink mark. Biter signed the order and gave it to Villa. He denies noticing that this purchase order referred to a new car. The jury apparently did not believe him. An owner service policy for a new Mercury car was also passed to Biter. He signed it also and gave it to Villa. Here was an additional direct representation by Biter to Villa that he was getting a new car. One other circumstance speaks strongly of guilt.

Biter testified before the Censor Committee of the Delaware Bar Association concerning this transaction.[7] Among other things, he said this:

"Q. Then your testimony is that you did have knowledge that it (the Jensby Mercury) was a used car? A. That is right. That it had been used.

"Q. Then you did approve of the sale of the used car as a new car? A. That is right.

"Q. Were you also familiar with the fact that it had been in some accident or wreck? A. Yes.

"Q. And the repairing of that damage had been done by your Company? A. That is right."

When taxed with this clear admission of guilt, Biter would only say that he had been badgered or browbeaten into so testifying. But fourteen months elapsed between the date of the giving of his testimony and the trial of this case. Meantime, Biter did not attempt to have his testimony changed or otherwise explained. The jury doubtless did not credit the explanation but accepted the testimony at its face value.

Weighing the evidence just analyzed against the background of applicable decisional law elsewhere discussed, I conclude as follows:

(1) There is substantial probative evidence to sustain the conviction of Biter's Auto Service, Inc., and Biter personally, of a conspiracy to defraud.[8] Accordingly, the motions of acquittal and for new trial[9] are denied.

---

[7] Regrettably, a member of the Bar whom Villa consulted after he found he had been victimized, was censured as a result of his professional conduct in connection therewith.

[8] The fact that Murphy plead guilty supplies the second party necessary to constitute a conspiracy.

[9] My decision would be the same even if I assumed that I were bound by the literal language of Rule 33. This is true of all counts.

 (2) There is substantial probative evidence to sustain the conviction of Biter personally upon the charge of aiding and abetting. His sitting at the table with Villa, taking the papers above described from Murphy, signing them and handing them back to Villa constitute direct evidence of aiding and abetting and, this, together with testimony, both direct and circumstantial, indicating a guilty knowledge of the entire background of this affair, constitute more than sufficient evidence to sustain the conviction. Accordingly, the motion for acquittal and for a new trial are denied.

 (3) There is circumstantial evidence from which a jury could have been fully satisfied not only that the circumstances were consistent with Biter's having turned back the speedometer in order to make a sale of the Mercury car, but also inconsistent with any other rational conclusion. While the testimony on this point was admittedly wholly circumstantial, yet, the conspiracy to defraud could not have been accomplished unless the Mercury automobile in question had a very low mileage on the face of the speedometer. When it left Jensby's possession, the speedometer indicated 800 miles. While in the actual or constructive possession of Biter's and before delivery to Villa, the reading was changed to 8 miles. As above observed, the speedometer could not have jumped back of its own accord. It had to be changed by a person skilled as a mechanic and acting under the direction of one interested in such a result. No mere employee of Biter's or of the repair shop which repaired the damaged fender would have had any possible interest in altering the speedometer on his own initiative. The inescapable inference is that it was done at the direction of an official of Biter's. The motions for acquittal and for new trial on this charge are also denied.