STATE of Maine

v.

Lauren RUYBAL.

STATE of Maine

v.

Lewis C. ARMSTRONG, Jr.

Supreme Judicial Court of Maine.

Dec. 14, 1979.

Michael D. Seitzinger (orally), Charles K. Leadbetter, William R. Stokes, Asst. Attys. Gen., Augusta, for plaintiff.

Lewellyn R. Michaud, Bangor (orally), for Ruybal.

Eugene C. Coughlin, III, Bangor (orally), for Armstrong.

Before McKUSICK, C. J., and POMER-OY, WERNICK, GODFREY, NICHOLS and GLASSMAN, JJ.

McKUSICK, Chief Justice.

After their convictions in separate jury trials presided over by the same Superior Court justice, both defendants presented motions for new trials based on the same newly discovered evidence. The motions were denied by a second justice assigned after the first justice had died. On appeal, defendants assert that the successor justice abused his discretion in concluding he was able to perform his duties adequately and that, in any event, the justice erred in denying the motions because the newly discovered evidence warrants the granting of a new trial in each case. We deny the appeals.

I. *Facts and Procedural History*

On November 28 to December 2, 1973, defendant Armstrong was tried before a jury in the Superior Court, Penobscot County, for the strangulation murder of his girlfriend, Jeannette Moore, at a motel in Bangor. Armstrong's appeal from his conviction and life sentence was denied by this court in *State v. Armstrong*, Me., 344 A.2d 42 (1975).

Later in December, 1973, before another Penobscot County jury, but with the same justice presiding, defendant Ruybal was tried and convicted for the stabbing murders of his wife's mother, Rose Pearson, and his wife's great-uncle, William Grounder, at their home in Old Town. Ruybal's appeal to this court from a life sentence was denied in *State v. Ruybal*, Me., 398 A.2d 407 (1979).

In both trials the prosecution introduced the testimony of Special Agent Thomas N. Curran of the F.B.I., an expert in forensic serology. In each case he testified to having performed certain laboratory tests on clothing and other physical evidence for the purpose of identifying blood and other human substances. In the Armstrong case, Curran identified as human blood, and in some instances as the victim's blood, stains on five towels that Armstrong had apparently used in an attempt to clean up the mess in his motel room after he had strangled his girlfriend; the purpose of the evidence was to rebut Armstrong's anticipated insanity defense. Curran's testimony in the Ruybal case, in which he identified various blood and semen stains, was relevant to connect Ruybal with the murders of his mother-in-law and her uncle and to corroborate details of the two confessions he made to the police.

In early 1975, more than a year after the convictions of both defendants, facts came to light establishing that Special Agent Curran, in the investigation of a case unrelated to these, had reported results of lab tests that he did not in fact conduct.[1] In the course of an internal F.B.I. inquiry into the matter, Curran lied under oath concerning the tests, and soon resigned from the F.B.I. While having no knowledge that Curran's lab tests in the two instant cases had been falsified, the F.B.I. informed the Maine Attorney General's office of the circumstances leading to Curran's resignation.

---

1. Later it was also discovered that Curran, while testifying in at least one criminal trial (again, not one of these) had, in stating his qualifications as an expert, claimed to hold a master's degree in biology when in fact, although he had completed all the course requirements for the degree, he had failed to write the required thesis.

Late in 1975, each defendant moved for a new trial on the ground of the newly discovered evidence. *See* Rule 33, M.R. Crim.P.[2] Because the identical fact situation gave rise to both new trial motions, they were consolidated for hearing before the justice who had presided at both jury trials. While it was established that Special Agent Curran had not in fact misrepresented his credentials in these two cases, it remained open to question whether he had testified truthfully concerning the lab tests. In June of 1976 the physical evidence in both cases was resubmitted to the F.B.I. for confirmatory testing. On August 17, 1976, the presiding justice held a hearing at which another F.B.I. special agent testified as to the results of his retesting of that physical evidence. By the retesting he substantially confirmed the conclusions reached earlier by Curran, but, because of the effect of the passage of time on the stain samples, he was unable to duplicate every procedure used by Curran. None of the retest results, however, cast any positive doubt on the accuracy of Curran's testimony.

At the instance of both defense counsel, the presiding justice requested the F.B.I. to release certain intradepartmental memoranda concerning the investigation of Curran. Because of F.B.I. Director Kelley's initial refusal to do so and the delay entailed by the administrative appeal of that decision, it was not until two years later, on August 29, 1978, that the requested information was finally turned over. Unfortunately, during that long postponement, in the summer of 1977 the presiding justice died. Subsequently another justice of the Superior Court (hereafter the "successor justice") was specially assigned to the cases pursuant to Rule 25, M.R.Crim.P.[3]

2. M.R.Crim.P. 33 provides:
 The court on motion of the defendant may grant a new trial to him if required in the interest of justice. . . .
 . . . A motion for a new trial based on the ground of newly discovered evidence may be made only before, or within two years after, final judgment. . . .

3. M.R.Crim.P. 25 reads:
 **Disability of a Justice**

On November 20, 1978, the successor justice received further exhibits, including the F.B.I. memoranda, together with the exhibits and transcript of the new trial hearing before the original presiding justice and the transcripts of both jury trials. On the same day he also heard oral argument from the parties. On January 25, 1979, the successor justice denied both motions for new trial. He stated:

The Court is satisfied that it can perform the duties of the justice who presided at trial under the provisions of Rule 25 . . . .

. . . There is no evidence presented to the Court that any testimony of the expert witness in these cases was in fact false. The Court is satisfied that it is more likely than not that the testimony was true. The Court is satisfied that any impeaching evidence if available at trial would not have changed the results.

On appeal to this court from the denial of their motions, defendants assert two grounds for reversal of the judgment of the Superior Court. First, they argue that the successor justice abused his discretion by refusing to grant a new trial on the ground of his inability properly to perform the duties of the presiding justice. Second, they allege error in the denial of their motions, asserting that new trials should have been granted because the newly discovered evidence tending to impeach Special Agent Curran's testimony would, they say, have clearly resulted in a different verdict. We reject both contentions.

## II. *The Successor Justice's Rule 25 Discretion*

No Maine case has yet discussed the standard by which a Superior Court justice

If by reason of death, resignation, removal, sickness or other disability, a justice before whom a defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt any other justice assigned thereto by the Chief Justice of the Supreme Judicial Court may perform those duties; but if such other justice is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

should decide whether to act under Rule 25, M.R.Crim.P., or under the comparable civil rule, M.R.Civ.P. 63, when presented with a motion for a new trial based on newly discovered evidence. Agreeing with the overwhelming majority of state and federal courts that have addressed the question, we decline to adopt a *per se* rule that a new trial must be granted whenever death or disability prevents the justice who presided at trial from ruling upon such a motion. *See* Annot., 83 A.L.R.2d 1032, 1040–41 (1962). By our reading of Rule 25, the decision whether to perform the duties of a "disabled" justice is a matter left to the sound discretion of the successor justice. This court will not disturb his decision to act unless an abuse of discretion can be demonstrated. The authorities construing the comparable federal rules of procedure, Fed.R.Crim.P. 25(b) and Fed.R.Civ.P. 63, are in accord with that view. *Connelly v. United States*, 249 F.2d 576 (8th Cir. 1957); *Carbo v. United States*, 314 F.2d 718 (9th Cir. 1963). *See* 2 Wright, *Federal Practice and Procedure (Criminal)* § 393 (1969).

■ Here the successor justice thoroughly familiarized himself with the written record of each case, including the trial transcripts, the testimony and exhibits from the August 17, 1976, hearing, and the internal F.B.I. memoranda. *See United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976); *Connelly, supra* at 579. He had the added benefit of hearing oral argument on the motions from the same attorneys who had tried the cases in the Superior Court. Neither case was particularly complicated. *See Phillips, supra* at 332. The justice could correctly have concluded that although the *credibility* of the witness Curran was at issue, an evaluation of his *demeanor* at trial would play no part whatever in the determination of the new trial motions. *Compare Federal Deposit Ins. Corp. v. Siraco*, 174 F.2d 360 (2d Cir. 1949) (demeanor was decisive factor where witnesses' story was inherently suspicious) *with Carbo, supra* at 750 (corroborating evidence "placed the government's case safely beyond demeanor impeachment"). *See also* 11 Wright & Miller, *Federal Practice and Procedure (Civil)* § 2922, at 338–39 (1973).

In the cases at bar the fact that the successor justice did not preside at the original jury trials is of reduced significance. Fully five years had elapsed between the trials and the ultimate submission of the new trial motions for decision. The original presiding justice, had he survived, would himself have had to rely extensively on the original trial record, rather than on any independent memory of what had transpired years before. In these circumstances we conclude that the successor justice did not abuse his discretion in deciding to rule on the defendants' new trial motions.

### III. *The Motions for New Trial*

■ We now come to each defendant's contention that the successor justice erred as a matter of law in denying his motion for a new trial. Because the justice ruling on a new trial motion ordinarily has the responsibility of "hearing the new testimony, observing the conduct of the witness, [and] weighing the value of the evidence and its potential for resulting in a different verdict," his decision "is essentially a determination of fact" and will be reviewed by the Law Court only for clear error. *State v. Sawyer*, Me., 314 A.2d 830, 834 (1974). In the unusual circumstances of the instant cases, however, where the successor justice made his ruling solely from the written record, this court is in as good a position as he to evaluate that record, and we will exercise our independent judgment to determine whether the motions were properly denied. *Cf. Boulay v. Boulay*, Me., 393 A.2d 1339, 1340 (1978) (civil case where "clearly erroneous" standard of M.R.Civ.P. 52 normally applicable); *Weeks v. State*, Me., 267 A.2d 641, 648 (1970) (review of decision by single justice in habeas corpus proceeding).

■ In order to prevail on a motion for a new trial on the ground of newly discovered evidence a defendant must demonstrate:

(1) that the evidence is such as will probably change the result if a new trial is granted, (2) that it has been discovered since the trial, (3) that it could not have been discovered before the trial by the

exercise of due diligence, (4) that it is material to the issue, and (5) that it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

*State v. Casale*, 148 Me. 312, 319–20, 92 A.2d 718, 722 (1952).

 We here need address only the fifth *Casale* test: whether "it is clear that such impeachment would have resulted in a different verdict." Neither Ruybal nor Armstrong disputes that the newly discovered evidence goes solely to the impeachment of Special Agent Curran's credibility.[4] Our examination of all the evidence at each of the murder trials convinces us that each defendant would have been convicted even if Special Agent Curran's testimony had been entirely discredited.

### A. *Ruybal's Motion*

Turning to the specific facts of Ruybal's case, the jury had before it his two confessions,[5] one oral and one written, in which defendant vividly described the events leading up to the murders and the manner in which they were committed. They also had Ruybal's contrived story given the morning of the crime, which later proved to be completely false. But the key to his conviction was the overwhelming corroboration of detail after detail of those confessions by the evidence obtained at the crime scene. The body of William Grounder was found in the bathroom and that of Rose Pearson on the front porch, precisely where defendant placed them in his confession. The evidence showed that the fatal wounds had been inflicted in the manner described by Ruybal. Further, he admitted to having had intercourse with Rose shortly before the murders took place; the autopsy of her body confirmed that fact. The autopsy also revealed the presence of three hairs stuck to Rose's body, and others were found on her nightcap and bedsheet. Subjected to microscopic analysis at the F.B.I. laboratory

(by someone other than Curran) the hairs, which appeared to be from the pubic region, were determined to be inconsistent with Rose Pearson's body hair, but consistent with Ruybal's. All that evidence corroborating Ruybal's confessions sealed his fate.

The testimony of Special Agent Curran concerned four items: Ruybal's green trousers, Rose Pearson's blue nightcap and housecoat, and the bottom sheet from her bed. Curran identified bloodstains on all four items as human blood, but was unable to determine the blood grouping. Curran also detected semen on the bedsheet. Except for the blood on Ruybal's pants, which directly linked him to the crime and contradicted his alibi, all of Curran's testimony was cumulative of other evidence presented by the State. Defendant argues that the evidence regarding his trousers was the only "solid" piece of evidence against him and without it the jury would not have returned a guilty verdict. We disagree. Even assuming that the newly discovered impeachment evidence would have neutralized Curran's entire testimony, the overwhelming evidence of defendant's guilt makes it far from *clear* that a different verdict would have resulted. Indeed, we are convinced that the jury would just as surely have convicted even without Curran's testimony.

### B. *Armstrong's Motion*

In Armstrong's case, the victim, Jeannette Moore, was beaten and strangled in defendant's motel room in Bangor late in the afternoon of February 13, 1973. During the autopsy, a piece of human skin was found imbedded in the victim's hair and was latter identified through fingerprint comparison as coming from Armstrong's left index finger. The testimony at trial showed that Armstrong and Jeannette Moore had been seen leaving a restaurant in Hampden at 4:30 p. m. that afternoon. About 6:30 p. m. the tenant in the motel

---

4. Neither does the State dispute that the second, third, and fourth criteria of *Casale* are satisfied.

5. In Ruybal's previous appeal this court held those confessions to have been obtained in full compliance with constitutional safeguards, 398 A.2d at 413.

room next door to defendant observed the latter with a towel wrapped around him, headed for the showers, and shortly thereafter saw defendant return to his room from the showers. Within half an hour, defendant entered a restaurant in Bangor where he used the public telephone. A cashier who knew defendant overheard portions of his conversation with his father and quoted him as saying, "I have done something bad. . . . Will you meet me with a minister."

At trial, in an effort to prove that "his unlawful act was the product of mental disease or mental defect," 15 M.R.S.A. § 102 (1965),[6] defendant offered the testimony of three experts—one psychologist and two psychiatrists—to the effect that he had been suffering from an "acute psychotic reaction." In anticipation of that defense and in order to show Armstrong's "presence of mind" at the time of the crime, the prosecution offered five bloodstained towels, found at the crime scene, inferentially used by defendant in an attempt to clean up his motel room after the murder. The sole relevance of Curran's testimony was to identify the stains as human blood of a type consistent with the victim's.[7] On appeal defendant concedes that he committed the act of killing but insists that without the evidence rebutting his evidence of "insanity" the jury would not have rejected the expert psychiatric testimony.

The full probative force of the towels as evidence against defendant was available to the prosecution even if Curran's testimony had not been in the case. Other testimony established that the towels had been found, bloodsoaked, on and around the profusely bleeding body of the homicide victim. The jury could naturally have drawn the inference that the stains were the blood of the

victim, and it would indeed be surprising if they had concluded otherwise. Moreover, aside from the bloodstained towels, there was other significant evidence from which the jury could infer that Armstrong's act was not the "product of mental disease or defect,"[8] including the fact that shortly after the crime defendant took a shower, shampooed his hair, and changed into clean clothing and then went to a public restaurant, and the evidence of defendant's statements to his father, in a telephone call from the restaurant, that he had "done something bad" and to meet him "with a minister." As in Ruybal's case we believe the jury would just as certainly have convicted Armstrong even if Curran's credibility had been impeached.

The entry in each case will be:

Appeal denied.

Denial of motion for new trial affirmed.

ARCHIBALD, J., did not sit.

---

6. Repealed by P.L. 1975, ch. 499, § 2, effective in 1976, subsequent to the Armstrong prosecution. The "insanity" defense is now governed by 17–A M.R.S.A. § 58 (Supp.1978). *See generally State v. Burnham*, Me., 406 A.2d 889, 890 n. 1 (1979).

7. As to three of the five towels, Curran could not identify the blood type and merely confirmed that the stains were human blood.

8. We note, as we did on Armstrong's previous appeal, 344 A.2d at 52, that his expert psychiatric testimony was at best conflicting and of a highly speculative nature. The jury could have chosen to reject the insanity defense, as to which defendant had the burden of proof, *State v. Buzynski*, Me., 330 A.2d 422 (1974), quite independently of any rebutting evidence on behalf of the State.