**STATE of Maine**

v.

**Robert MELANSON.**

Supreme Judicial Court of Maine.

Argued May 3, 1989.

Decided Nov. 15, 1989.

R. Christopher Almy, Dist. Atty., Philip C. Worden (orally), Asst. Dist. Atty., Bangor, for plaintiff.

Claire Julian (orally), Portland, for defendant.

Before McKUSICK, C.J., and
WATHEN, GLASSMAN, CLIFFORD,
HORNBY and COLLINS, JJ.

WATHEN, Justice.

Robert Melanson appeals from the judgments of the Superior Court (Penobscot County, *Silsby, J.*) entered on the jury's verdicts finding him guilty of four counts of gross sexual misconduct, *see* 17-A M.R.S.A. § 253(2)(E) (Supp.1988).[1] Melanson contends, *inter alia*, that the trial court erred in denying his motion for a new trial on the grounds of newly discovered evidence and that there is insufficient evidence to support the jury's verdicts. Finding no error, we affirm the judgments.

The indictment returned against Melanson charged him with four counts of gross sexual misconduct occurring between November 10, 1985 and December 1, 1985. Melanson entered a plea of not guilty to each count. The record discloses that Melanson was 23 years of age and for a number of years had been employed at Bangor Mental Health Institute (BMHI) as a mental health worker. The alleged victim has an extensive history of hospitalizations in mental health facilities. From November 2 to December 2, 1985 she was a voluntary patient on Ward D-1 at BMHI at which time she was transferred to the discharge unit where she remained a patient through February 1986. Her psychiatrist testified she was suffering from three separate but related conditions: She was schizo-affective, having a propensity to hear voices and become out of touch with reality and mood cycles ranging from hyperactive to very depressed and suicidal. She has a poly-substance abuse problem, abusing both alcohol and street drugs. She also had a mixed personality disorder, causing, *inter alia*, a great deal of trouble with relationships, relating to and getting along with other people, and problems with her every day life. Her psychological problems during the instant hospitalization at least in part had focused on sexual matters, with "some type of sexual obsession relating to her son."

On February 23, 1986, the alleged victim had a conversation with Timothy Davis, a mental health worker in the discharge unit of BMHI. She told him that while on Ward D-1 a number of sexual encounters had taken place between herself and a staff member on D-1, whom she described in a "relatively vague" manner, mentioning that the individual owned horses. Davis then inquired if the individual's name was "Rob," and the victim replied in the affirmative.[2] The following day, Davis confronted Melanson with the victim's allegations. Melanson was later questioned by Detective John Welch of the Bangor Police Department.

The State's case rested on the testimony of the alleged victim as corroborated by the testimony of Davis and Welch as to Melanson's knowledge of the claimed misconduct. Davis testified that during his interview with Melanson he purposefully did not disclose the alleged victim's name and that it was Melanson who identified her by name. Welch testified that in the course of his interview with Melanson he had deliberately hesitated at a point that "seemed to be asking for the name of the person involved" to get Melanson to furnish the name before Welch gave it to him. Melanson furnished the name of the alleged victim and was told by Welch that that "was his second mistake." Melanson then explained to Welch that the reason he knew the alleged victim's name was that it had been given to him in his previous conversation with Davis.

At trial, Melanson denied the charges and denied that he had ever been alone with the alleged victim during her hospital-

---

1. 17-A M.R.S.A. § 253(2)(E) (Supp.1988) states:
A person is guilty of gross sexual misconduct
. . . .
2. If he engages in sexual intercourse or a sexual act with another person and:
E. The other person, not his spouse, is in official custody of a probationer or a parolee, or is detained in a hospital, prison or other

institution, and the actor has supervisory or disciplinary authority over that other person[.]

2. There was evidence that it was common knowledge at BMHI that Melanson owned horses.

ization at BMHI. He testified that it was Davis who first identified the alleged victim by name during the interview. Following the jury's verdict finding Melanson guilty of the charged offenses, he moved for a new trial based on newly discovered evidence. After a hearing, the trial court denied Melanson's motion, and Melanson appeals.

At the hearing on the motion for a new trial, Melanson offered the testimony of a co-worker of Davis, who was also employed as a mental health worker on the discharge unit at BMHI. She testified that later in the same day that Davis had confronted Melanson with the charges of the alleged victim, Davis told her that in the course of that interview "he [Davis] had made a mistake and let the [alleged victim's] name slip." The court denied the motion for a new trial. The court concluded that although Melanson met the other requirements for a successful motion, the proffered new evidence would serve only for impeachment purposes and it would not result in a different verdict.

A higher standard applies to a motion for a new trial based upon a newly discovered basis for impeaching a witness. Although the conventional formulation of the rule permits a new trial if the newly discovered evidence "will probably change the result", it specifically excepts evidence of impeachment, "unless it is clear that such impeachment would have resulted in a different verdict." *State v. Casale*, 148 Me. 312, 319–20, 92 A.2d 718, 722 (1952). That language is derived from an early case in which we explicitly described the test in the following terms:

> If from the nature of the evidence that the moving party seeks to rely upon, as disclosed by the motion and affidavits, it is apparent no purpose can be served other than the impeachment of the testimony of an adversary, or of witnesses of the adverse party, a new trial should not be granted unless the testimony of the witness sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing *that a different result must necessarily follow.* 20 R.C.L., 294.

> Newly discovered evidence which only goes to impeach the credibility or character of a witness is not sufficient ground for a new trial unless it is clear that such impeachment would have resulted in a different verdict. *Beals v. Cone*, 27 Colo., 473; 62 Pac., 948; 83 A.S.R., 92.

*London v. Smart,* 127 Me. 377, 379, 143 A. 466, 468 (1928) (emphasis added).

In the present case, the presiding justice ruled that the evidence impeaching the State's witness would not necessarily result in a different verdict. That determination is a question of fact and will be sustained on appeal unless it is clearly erroneous. *State v. Pierce*, 438 A.2d 247, 253 (Me.1981). Given the requirement for a nearly certain change in result, the presiding justice did not clearly err in assessing the impact of the newly discovered evidence.

The evidence as reflected in the record is sufficient to support the verdicts of the jury. *See State v. Barry*, 495 A.2d 825, 826 (Me.1985). We find no merit in the other issues raised by Melanson on this appeal.

The entry is:

Judgments affirmed.

McKUSICK, C.J., and HORNBY and COLLINS, JJ., concur.

GLASSMAN, Justice, with whom CLIFFORD, Justice, joins, dissenting.

I must respectfully dissent. I would vacate the judgment and remand this case to the Superior Court. The law is well established that the tests to be applied in either a civil or a criminal case to a motion for a new trial on the ground of newly discovered evidence are:

(1) the evidence is such that as will probably change the result if a new trial is granted, (2) that it has been discovered since trial, (3) that it could not have been discovered before the trial by the exercise of due diligence, (4) that it is material to the issue, and (5) that it is not *merely* cumulative or impeaching, unless

it is clear that such impeachment would have resulted in a different verdict.

*State v. Casale*, 148 Me. 312, 319–20, 92 A.2d 718, 722 (1952) (emphasis added), quoted in *State v. Jacques*, 537 A.2d 587, 591 & n. 3 (Me.1988) (quoting *State v. Grover*, 518 A.2d 1039, 1042 (Me.1986)).

In the instant case the trial court found the proffered evidence had been discovered since trial, that it could not with diligence have been discovered before trial, and that it was material. However, the trial court erroneously characterized the newly discovered evidence as merely impeaching. This mischaracterization of the evidence has led both the trial court and this court to apply erroneously the more rigorous standard that the newly discovered evidence must be "so strong and convincing *that a different result must necessarily follow.*"

In *London v. Smart*, 127 Me. 377, 143 A. 466 (1928), and *State v. Casale*, 148 Me. 312, 92 A.2d 718 (1952), cited by the court, the court found, and it is clear from its content, that the proposed testimony was not material to the real issue in the case but *merely* impeaching in nature.[1] In marked contrast, the proposed testimony in this case is vitally material to the real issue presented to the jury—did Robert Melanson have any knowledge of the alleged sexual assault on the BMHI patient prior to Melanson's conversation with Timothy Davis? A brief review of the trial transcript reveals the importance of this new evidence.

As stated by the court, the prosecutrix suffered from several mental health disorders, has an extensive history of hospitalizations in mental health facilities and was hospitalized at the time of the alleged offense for psychological problems at least partly attributable to "some type of sexual obsession relating to her son." Her testimony at trial amounted to a claim that she and Melanson had sexual contact during the daytime in BMHI rooms to which each of the doctors, social workers and mental health workers had his or her own key and to which all other patients had access. Despite the fact that there were 25–30 patients, 6 or 7 mental health workers, plus several nurses, a supervisor, a social worker and a clerk on Ward D–1, there was no testimony other than that of the prosecutrix that she and Melanson had ever been in each other's company alone. Nor was there any evidence that the two of them had been *seen* together either on or off Ward D–1. Her prior descriptions of the alleged sexual contacts were at best partially inconsistent with the version she gave at trial. There was no physical or medical evidence presented at the trial indicating that the charged sexual intercourse had occurred.

Davis testified that he was very careful not to reveal the alleged victim's name when he told Melanson of the accusations and that it was Melanson who revealed her name. Melanson, by his testimony, denied that he had ever been alone with the alleged victim and denied that he had any knowledge of the incidents of the alleged sexual misconduct until Davis named the patient and related to Melanson her accusations against him.[2]

The testimony of the alleged victim and that of Melanson not only was in direct conflict as to whether she had been sexually assaulted by Melanson but also as to whether they had ever been in circumstances that would allow an opportunity for the occurrence of the claimed sexual acts. The testimony of Davis, a purportedly disinterested witness, from which the jury could have reasonably inferred that Melanson knew that the alleged victim had been sexually assaulted, cannot be underrated in its importance to the jury's ultimate finding of Melanson's guilt.

---

1. In the *London* case, the court also found that the proffered evidence could have been obtained at the first trial by the exercise of due diligence. *London,* 127 Me. at 379, 143 A. at 467.

2. Davis was not authorized to interview Melanson. He did so on his own initiative, advising Melanson to quit his job to avoid publicity and trouble. Melanson refused to quit and testified that he suggested Davis refer the matter to the Patient's Advocate, the proper staff member to receive and investigate complaints of any patient of BMHI.

The newly discovered evidence proffered by Melanson was the testimony of a mental health worker in the same discharge unit of BMHI where Davis worked. She stated that she knew both Davis and Melanson as co-workers at BMHI but had no other contact with them. She also testified that when she reported to work on the date of the conversation between Davis and Melanson concerning the alleged victim's accusations, Davis told her of the accusations, of his conversation with Melanson and that "[h]e [Davis] had made a mistake, that when he approached Rob [Melanson] with the allegations, he [Davis] made a mistake and let the patient's name slip."

Clearly, this admission by Davis goes to the very heart of Melanson's defense. *Cf. State v. Conlogue*, 474 A.2d 167, 172 (Me. 1984) (importance of probative evidence tending to deflect guilt from defendant to defendant's right to present an effective defense). We recognized the difference between the kind of material evidence offered here and that which is *merely* impeaching in *Shalit v. Shalit*, 126 Me. 291, 296–97, 138 A. 70 (1927).

> If the evidence contradicted is immaterial the only legitimate purpose of its contradiction · is to impeach the witness and discredit his testimony upon other and material matters. There can be no new trial based upon such newly discovered contradictory evidence. But if the testimony relates to a material issue a new trial will not be denied merely because its contradiction tends to impeach or discredit a witness.

*See also Nathan M. Rodman Co. v. Kostis*, 121 Me. 90, 115 A. 557 (1921); *Bridgham v. Hinds*, 120 Me. 444, 115 A. 197 (1921); *White v. Andrews*, 119 Me. 414, 111 A. 581 (1920); *Drew v. Shannon*, 105 Me. 562, 75 A. 122 (1909); *Parsons v. Railway*, 96 Me. 503, 52 A. 1006 (1902); *Stackpole v. Perkins*, 85 Me. 298, 27 A. 160 (1893).

As long ago as *Parsons v. Railway*, 96 Me. at 506–509, 52 A. at 1006–1008, we rejected the rule for both civil and criminal cases that would require that newly discovered evidence material to the issue of the case, which might also contradict, tend to impeach or discredit a witness, be of such character as to result *necessarily* in a different verdict before a new trial can be granted. We stated that such a strict rule would "deprive a party of the privilege of having his new evidence passed upon by a jury, whose peculiar province it is to decide controverted issues of fact" and that the correct rule is that "there must be a probability that the verdict would be different upon a new trial. But it is not necessary that the additional testimony should be such as to *require* a different verdict." (Emphasis in original).

It is apparent from the record that the trial court applied the stricter test that a different result would not *necessarily* follow if a new trial were granted on the premise that the new testimony was merely impeaching because it was contradictory to that of Davis and could tend to impeach or discredit Davis's testimony.

Because the newly discovered evidence is material to a central issue in this case, the trial court erred in its premise that it was merely impeaching. Thus, the appropriate test, as set forth in *Shalit* and *Parsons* is whether the evidence is such that it will *probably* change the result if a new trial is granted. It is clear from the record that if the proffered newly discovered evidence were submitted to the jury with the other evidence in this case a change in the result is *probable*. Accordingly, I would vacate the judgment and remand the case for entry of an order granting Melanson a new trial.