**STATE of Maine**

v.

**Harold R. ESTES, Jr.**

Supreme Judicial Court of Maine.

Argued March 13, 1980.
Decided Aug. 27, 1980.

---

Charles K. Leadbetter, Michael D. Seitzinger (orally), Asst. Attys. Gen., Augusta, for plaintiff.

Paine & Lynch, Martha J. Harris (orally), Bangor, for defendant.

Before GODFREY, NICHOLS, GLASS-MAN and ROBERTS, JJ., and DU-FRESNE, A. R. J.

GLASSMAN, Justice.

The defendant, Harold R. Estes, Jr., appeals from the judgment of the Superior Court, Penobscot County, entered December 27, 1978, following a jury trial in which the jury found the defendant guilty of three counts of murder, 17–A M.R.S.A. § 201(1)(A), one count of attempted murder, 17–A M.R.S.A. § 152, and one count of kidnapping, 17–A M.R.S.A. § 301(1)(A)(4).

The defendant raises numerous claims of error in the evidentiary rulings of the presiding Justice and in his instructions to the jury. He also challenges the sufficiency of the evidence to support the kidnapping conviction and the denial of his motion for a new trial on the ground of newly discovered evidence. The defendant has abandoned, for the purposes of this direct appeal, an additional claim that he was deprived of the effective assistance of counsel. We affirm the judgment as to all counts.

The evidence at trial established that on the morning of January 27, 1978 the defendant left work in Brewer and traveled to Bangor where he purchased a .22 caliber rifle, identified as the murder weapon, and some ammunition. The defendant then bought a bottle of liquor and rode by taxi to the Vaillancourt home in Holden. When the defendant arrived there at approximately 10:30 a. m., the occupants, Alphonse Vaillancourt; his wife, Mary; his son, David; and his daughter, Christina, the defendant's estranged wife, were not at home. The defendant entered the house by breaking the window of the back door. Once inside the residence, the defendant loaded his rifle, poured the first of several drinks and awaited the return of the occupants. He testified that at this time he was undecided whether to shoot the Vaillancourts or "just [to] shoot up the place right in front of them . . . ."

At approximately 1:00 p. m., Alfred Gendreau, a nephew of Alphonse and Mary, arrived at the house. The defendant confronted Gendreau with his loaded rifle, forcing him to go into a bedroom and to lie on one of the beds. Gendreau testified that the defendant was in an agitated, emotional state and that he informed Gendreau he intended to kill the Vaillancourts and Christina when they returned. The defendant testified that he restrained Gendreau initially to prevent him from informing the police. During the course of Gendreau's detention, the defendant offered him the rifle if Gendreau would shoot him. The defendant subsequently released Gendreau unharmed at approximately 2:30 p.m.

The three Vaillancourts, Christina and Alton Fletcher, Mary's brother, arrived home from work at approximately 3:00 p. m. As they stepped onto the front porch, the defendant began shooting from a few feet away. Alphonse, Mary and David Vaillancourt died. Fletcher, although shot twice by the defendant, survived his wounds.

Early the following morning, police in Lumberton, New Jersey apprehended the defendant, who had driven to New Jersey with Christina and their children to stay with the defendant's brother.

The defendant was indicted for three counts of murder, one count of attempted murder and one count of kidnapping. He pleaded not guilty and not guilty by reason of insanity to each offense. At his unitary trial, the defendant admitted the shootings but endeavored to prove a lack of criminal responsibility and to contest whether the State had proven that he had a culpable state of mind. As to the kidnapping charge, the defendant denied restraining Gendreau with an intent to terrorize. The jury found the defendant guilty of all five offenses.

## I. Admission of the Defendant's Incriminating Statements

### A. Statements Made to Officer Kanicki

Officer Kanicki of the Lumberton, New Jersey Police Department arrested the defendant in that town early on the morning following the murders. Almost immediately and over the course of the next thirty minutes, the defendant made and repeated a series of incriminating statements. The only questions directed to the defendant by the police during this period were those pertinent to the identity of the defendant and certain "booking" information.

At trial, the State offered Kanicki's testimony as to the incriminating statements made by the defendant. Although the defendant had not filed a pre-trial motion to suppress this testimony, he was given an opportunity to examine Kanicki outside the presence of the jury. Kanicki testified that he made no attempt to question the defendant and consequently did not advise him of his *Miranda* rights. The presiding Justice ruled that beyond a reasonable doubt the defendant's statements were volunteered and not the product of either custodial interrogation or coercion. Kanicki then testified as to the statements made to him by the defendant.

■ On appeal, the defendant does not argue that his arrest was unsupported by probable cause, see, e. g., *State v. Ann Marie C.*, Me., 407 A.2d 715, 722 (1979), but rather that his statements were the product of custodial interrogation and were therefore inadmissible in the absence of *Miranda* warnings. In the case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the State may not use either inculpatory or exculpatory statements of a defendant "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self–incrimination." *Id.* at 444, 86 S.Ct. at 1612. Only recently, the United States Supreme Court had occasion to define what is meant by "interrogation" within the context of this holding in *Miranda*. The Court stated:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, —— U.S. ——, ——, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307–08 (1980).

This holding is consistent with our prior decision in *State v. Simoneau*, Me., 402 A.2d 870 (1979), in which we noted that "[b]rief, routine questions posed to a suspect during 'booking' procedures, for example, do not constitute 'interrogation.'" *Id.* at 873. Since the record fully supports the finding

of the presiding Justice that the defendant had not been subjected to "interrogation" or coercion, there was no error in the admission of Kanicki's testimony.

## B. Statements Made to Detective Forte

Shortly after making the voluntary statements to Kanicki, the defendant was informed that he would be questioned concerning a triple homicide in Maine. Although he was asked no questions at this time, the defendant was advised of, and waived, his *Miranda* rights. Approximately forty-five minutes later, Detective Forte, homicide investigator for the county prosecutor's office, arrived and repeated the *Miranda* warnings, which the defendant again waived, this time both orally and in writing. In response to questioning by Forte, the defendant confessed to his involvement in each of the crimes charged. The defendant subsequently made a more detailed confession which was taped and transcribed. This transcription was corrected and signed by the defendant.

The defendant did not file a pre-trial motion to suppress this evidence. When the State offered the confessions at trial, the presiding Justice ordered a hearing as to the admissibility of the confessions outside the presence of the jury. After Forte testified to the above facts–the defendant produced no witnesses–the presiding Justice found that beyond a reasonable doubt the defendant had knowingly and voluntarily waived his *Miranda* rights and that the confessions comported with due process voluntariness. Forte then testified as to the defendant's incriminating statements, and the defendant's written confession was read to the jury.

■ On appeal, the defendant claims that this evidence should have been excluded as the fruit of his prior statements to Kanicki and because his *Miranda* waivers were not knowing and voluntary. The defendant's first argument fails because as demonstrated above the statements to Kanicki were not obtained in violation of the defendant's *Miranda* rights. *E. g., State v. Craney*, Me., 381 A.2d 630, 631 (1978). The defendant's

second claim that his repeated waivers of his *Miranda* rights were defective because he had not slept or eaten and was in an agitated mental state was not presented to the lower court since no evidence as to these alleged facts was presented at the hearing on the admissibility of the confessions made to Forte. In any event, reviewing the record in its entirety, we find that there was more than sufficient evidence to provide rational support for the finding of the presiding Justice that beyond a reasonable doubt the defendant had waived his rights under *Miranda*. *See, e. g., State v. Stone*, Me., 397 A.2d 989, 997 (1979).

## II. Sufficiency of the Evidence To Support the Kidnapping Conviction

Count V of the indictment charged the defendant with kidnapping, 17–A M.R.S.A. § 301(1)(A)(4). The relevant portion of the indictment read that the defendant

knowingly restrain[ed] one Alfred Gendreau with the intent to terrorize him, to wit; said Harold R. Estes, Jr. then and there knowingly confined said Alfred Gendreau for a substantial period of time in the place where his restriction commenced, to wit, did confine the said Alfred Gendreau for approximately one hour in the home of Alphonse Vaillancourt wherein his restriction commenced, and the said Harold R. Estes, Jr. then and there knowingly communicated to said Alfred Gendreau a threat to intentionally or knowingly kill Alphonse Vaillancourt, Mary Vaillancourt, David Vaillancourt, Christina (Tina) Estes, and him the said Alfred Gendreau . . . .

The defendant argues that there was no evidence showing he intended to terrorize Gendreau and that the evidence of Gendreau's one–and–one–half–hour confinement was legally insufficient to satisfy the "substantial period" requirement necessary to establish restraint under 17–A M.R.S.A. § 301(2).

■ From a reading of the relevant statutes, it appears that to secure a conviction under 17–A M.R.S.A. § 301(1)(A)(4) the State must prove beyond a reasonable

doubt that the defendant knowingly restrained the victim with the intent to place the victim in fear of a crime of violence dangerous to human life against the victim or another person by communicating to the victim a threat to commit such a crime under circumstances in which a reasonable person in the victim's position would be placed in fear by such a threat. *See* 17–A M.R.S.A. § 301(1)(A)(4); *id.*, § 210. The evidence bearing on this issue may be summarized as follows: Immediately upon Gendreau's entry into the Vaillancourt home, the defendant pointed a gun at his stomach and ordered him to "[c]ome in here." The defendant then ordered Gendreau into a bedroom and told him to lie down on a bed. He told Gendreau that he intended to kill Alphonse, Mary and David Vaillancourt and Christina Estes, relatives of Gendreau. While confining Gendreau in the bedroom, the defendant fired his rifle at a television set, blowing the screen out of the set. The defendant then said to Gendreau, "You think this gun is not loaded." The defendant communicated his readiness to commit the murders by saying to Gendreau, "I'll only have a couple of years for it. I'll plead temporary insanity." Gendreau was held at gunpoint for one and one–half hours during which time he was "scared." The defendant testified that when he told Gendreau he was going to kill the Vaillancourts he "was just scaring him."

This evidence was more than sufficient to establish beyond a reasonable doubt that the defendant intended to communicate to Gendreau a threat to commit a crime of violence dangerous to human life against Gendreau and the others enumerated in the indictment. "[P]roof of the accused's intent at the time of the commission of the alleged criminal act may be drawn from the act itself or from the existing circumstances surrounding the incident, as well as from any other evidence having a legitimate tendency to shed light upon the accused's intent or mental state at the time." *State v. Anderson*, Me., 409 A.2d 1290, 1296 (1979); *State v. Littlefield*, Me., 389 A.2d 16, 22 (1978).

The defendant also contends that the one–and–one–half–hour period of confinement of Gendreau does not satisfy the requirement of 17–A M.R.S.A. § 301(2)(C) that the confinement be for a "substantial period." The Comment to Section 301 makes clear that the inclusion of the substantial period requirement in the statutory definition of "restrain" was intended to avoid having kidnapping include conduct that was merely incidental to the commission of some other crime against the victim: "The third designated means [confinement for a substantial period] is designed to preclude kidnapping liability when the burglar puts the householder in the closet while he fills his sack with the silver." Comment, 17–A M.R.S.A. § 301. A comparison of Section 301 with Section 212.1 of the Model Penal Code demonstrates that our kidnapping statute was in significant respects based on the definition of kidnapping in the model code. The draftsmen of that code similarly expressed an intention to exclude from the definition of kidnapping restraints which were merely incidental to the commission of another offense against the victim. *See* Model Penal Code § 212.1, Comments at 13–16 (Tent. Draft No. 11, 1960). Here, the restraint was not merely incidental to the commission of some other offense against Gendreau. The restraint accompanied by the required intention to terrorize Gendreau was the essence of the wrongful conduct. *See State v. Littlefield, supra,* 389 A.2d at 21. Under such circumstances, confinement for a period of one and one–half hours more than satisfied the statutory requirement.

For the foregoing reasons, we conclude that the evidence was sufficient to permit a rational trier of fact to conclude beyond a reasonable doubt that the defendant had committed the crime of kidnapping as charged in the indictment. *See, e. g., State v. Lagasse*, Me., 410 A.2d 537, 542 (1980).

III. Denial of Motion for New Trial

At trial, the State's psychiatric expert, Dr. Lawrence C. Salvesen, testified that he had seen the defendant at the Bangor Mental Health Institute (BMHI) on several oc-

casions and that in his opinion the defendant was criminally responsible for his conduct. Questioned on direct examination regarding the basis for his opinion, Salvesen replied:

I spent at least three separate hours talking with Al St. Germain and Mr. Estes. Additionally, I saw him for short periods of time, but that was basically to review his current status, which fluctuated greatly from day to day. And I met with Al St. Germain for probably four to five hours scattered throughout my—well, let's see—five, six—two and a half months there during which Mr. Estes also was there to review what we had learned together and what Mr. St. Germain had picked up separately. Additionally, I went over Jack Ford's report from the Counseling Center and was made aware of certain police information.

Following entry of judgment, the defendant seasonably filed a motion for a new trial, claiming, *inter alia*, that newly discovered evidence revealed that Salvesen had testified inaccurately concerning the amount of time he had spent with the defendant. At the hearing on this motion, the defendant produced Albert St. Germain, a program director at BMHI. St. Germain testified that he, Salvesen and the defendant had met together for a total of one and one-half hours rather than the three hours to which Salvesen had testified. Other than this inconsistency, the testimony of St. Germain tended to corroborate that of Salvesen. St. Germain also acknowledged that Salvesen could well have examined the defendant without St. Germain's knowledge. The defendant briefly testified that he met with Salvesen only on the day he entered BMHI for psychiatric evaluation. Following this hearing, the Superior Court Justice denied the motion for a new trial.

■ On appeal, the defendant claims that this ruling of the Superior Court Justice was clearly erroneous because the "newly discovered" evidence adduced at the post-trial hearing shows Salvesen's trial testimony, that he met with St. Germain and the defendant for three hours, was either a

mistake or perjury and because the expert testified on the critical issue of insanity. To prevail on a motion for a new trial on the ground of newly discovered evidence, a defendant must show

'(1) that the evidence is such as will probably change the result if a new trial is granted, (2) that it has been discovered since the trial, (3) that it could not have been discovered before the trial by the exercise of due diligence, (4) that it is material to the issue, and (5) that it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.' *State v. Ruybal*, Me., 408 A.2d 1284, 1287–88 (1979), *quoting State v. Casale*, 148 Me. 312, 319–20, 92 A.2d 718, 722 (1952).

■ In the instant case, we need only discuss the third and fifth criteria of the *Casale* test. As to the third criterion, there is no showing that the evidence could not have been discovered before trial by the exercise of due diligence. The evidence in question related only to the time spent by Salvesen with the defendant. The defendant was in a position to know how much time he spent with Salvesen both in and out of St. Germain's presence. Furthermore, the defendant's counsel knew and spoke with St. Germain both before and during the trial and, by appropriate questioning of St. Germain, could have discovered the facts adduced at the new trial hearing.

As to the fifth criterion, the defendant has not demonstrated that the use of the impeaching evidence would clearly have resulted in a different verdict. The basis for Salvesen's opinion remains largely unshaken by the evidence adduced at the new trial hearing. It is far from clear that the jury would have accepted the defendant's claim of insanity merely because of a discrepancy in the amount of time spent in the joint evaluation of the defendant. The denial of the motion for a new trial on the ground of newly discovered evidence was not clearly erroneous. *See, e. g., State v. Heald*, Me., 395 A.2d 457, 458–59 (1978).

## IV. Instructions Concerning Proof Beyond a Reasonable Doubt

In his instructions to the jury, the presiding Justice stated:

[T]he State's burden is to prove—to satisfy the minds of the Jury of the Defendant's guilt beyond a reasonable doubt. . . . [R]easonable doubt really defines itself. It is its own best definition, that's the standard. Now, it's not necessary for the State to prove guilt beyond all possible doubt or to a mathematical certainty. Such proof is rarely, if ever available in the realm of human affairs. The test, as I've already said, is one of reasonable doubt. *Reasonable doubt is just what the words imply; a doubt based on reason and common sense, the kind of doubt that would make a reasonable person hesitate to act. Proof beyond reasonable doubt must therefore be of such a convincing character, that you would be willing to rely and to act upon it without hesitation in the most important of your own affairs.* We still come back to the fact that it really is its own best definition. The State has to prove each and every element beyond a doubt. What kind of a doubt? All doubt? No. A whimsical doubt? No. Beyond a reasonable doubt, and that's the standard. All right, and that's what you're going to apply here. (Emphasis added).

The defendant argues that this instruction was erroneous because it contained the term "common sense" and because the instruction included the so-called "affirmative action" analogy. These references, the defendant claims, impermissibly reduced the State's burden of proof. Because the defendant failed to object to the instructions given, review of these claims is governed by the obvious error standard of M.R. Crim.P. 52(b). *See, e. g., State v. Carey,* Me., 303 A.2d 446, 449 (1973).

In attempting to define reasonable doubt, the presiding Justice added "a doubt based on reason and common sense." The defendant claims that the inclusion of this term impermissibly suggested to the jury that a doubt based on reason alone was not sufficient to acquit; a juror must additionally find that his doubt was also based on common sense. The court's reference to "common sense" imposed no additional requirement but served only to emphasize that the jury should bring good judgment to bear on its deliberations. *Cf. United States v. MacDonald,* 455 F.2d 1259, 1262–63 (1st Cir.) (reasonable doubt is doubt for which "an intelligent reason" can be stated; reference "was solely to emphasize to the jury that its verdict should be the product of a rational thought process"), *cert. denied,* 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1972). Therefore, the instruction given was unlike one defining reasonable doubt as " 'doubt as for the existence of which a reasonable person can give or suggest a good and sufficient reason,' " *Dunn v. Perrin,* 570 F.2d 21, 23 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978), or as " 'a doubt in your mind that you can stand up in the jury room and argue with principle and integrity to your fellow jurors,' " *Bumpus v. Gunter,* 452 F.Supp. 1060, 1061 (D.Mass.1978). Moreover, this Court has noted with approval an instruction containing identical language. *See State v. Carey, supra,* 303 A.2d at 451.

In a further attempt to explain the State's burden of proof, the presiding Justice gave what the defendant claims was the "affirmative action" analogy—proof beyond a reasonable doubt defined as that quantum of proof upon which laymen would act in making important decisions in their daily lives. The use of the affirmative action analogy in criminal cases to explain the State's burden of proof has generally been condemned. *E. g., Scurry v. United States,* 347 F.2d 468, 470 (D.C.Cir.1965), *cert. denied,* 389 U.S. 883, 88 S.Ct. 139, 19 L.Ed.2d 179 (1967); *Bumpus v. Gunter, supra,* 452 F.Supp. at 1062–63; *Commonwealth v. Ferreira,* 373 Mass. 116, ——, 364 N.E.2d 1264, 1272–73 (1977). On the other hand, courts commonly approve an instruction explaining reasonable doubt as "such a doubt as in the graver transactions of life would cause reasonable, fair–minded, honest, and impartial people to hesitate and

pause." *State v. Poulin*, Me., 277 A.2d 493, 496 (1971); *e. g., Dunn v. Perrin, supra*, 570 F.2d at 24–25; *see Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).

■ Noting that in important affairs people "might frequently take affirmative action in the face of serious doubts," this Court pointed out in *State v. Carey, supra*, "that the safer and, therefore, preferred, practice is for the presiding Justice to avoid entirely resort to the 'affirmative action' analogy." 303 A.2d at 450. Where, however, as here, the analogy is accompanied by a description of reasonable doubt as that quantum of proof sufficient to cause a reasonable person to hesitate to act—or to act without hesitation—the use of the affirmative action analogy is permissible. *See id.* Indeed, defining reasonable doubt in terms of hesitation to act is a concept having a long tradition in the state of Maine. *See, e. g., State v. Merry*, 136 Me. 243, 262, 8 A.2d 143, 153 (1939). Despite this long tradition, as we noted in *State v. Carey, supra*, the preferable practice is to avoid any resort to this analogy.

The defendant also contends that those portions of the charge that define reasonable doubt in its own terms do not help the jury to understand the State's burden. The State argues that it is proper to define reasonable doubt simply as a doubt which is reasonable. *See, e. g., State v. Maxwell*, Me., 328 A.2d 801, 806 (1974); *Dunn v. Perrin, supra*, 570 F.2d at 23 n.2. Viewing this instruction in its entirety, *see, e. g., State v. Foster*, Me., 405 A.2d 726, 730 (1979), we find no error since we conclude the charge sufficiently apprised the jury of the degree of belief to which it had to be convinced in order to return a verdict of guilty. On the other hand, we reject the suggestion that merely to define reasonable doubt in its own terms adequately advises the jury of the State's burden of persuasion. We recognize that many appellate courts have suggested that no better definition of the term "reasonable doubt" can be devised than the words themselves. *See generally* 23A C.J.S. *Criminal Law* § 1268 (1961) (col-

lecting cases). Yet, the repeated efforts of trial judges, who deal daily with trial juries, to expand upon the definition convince us that they accurately discern a necessity further to explain those words to the jury in some meaningful way. In the famous case of *Commonwealth v. Webster*, 59 Mass. (5 Cush.) 295 (1850), Chief Justice Shaw defined reasonable doubt: "It is that state of the case, which, after the entire comparison *and consideration of the evidence*, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty of the truth of the charge." *Id.* at 320. Almost 100 years later, Professor McBaine defined reasonable doubt as follows: "A reasonable doubt exists where after a comparison and consideration of all the evidence the mind of the judge or the minds of the jurors are *not convinced that it is almost certain that* the accused committed the crime with which he is charged . . . ." McBaine, *Burden of Proof: Degrees of Belief*, 32 Calif.L.Rev. 242, 265 (1944).

■ As this Court noted over a century ago, "[o]ther definitions almost without number might be cited but all, though different in words, are to the same effect, and all describe an absence of reasonable doubt, as a state of mind existing in the jurors amounting to a reasonable and moral certainty, in distinction from an absolute certainty." *State v. Reed*, 62 Me. 129, 144 (1874). Although we hesitate to adopt a formula instruction which must be given in all cases, we believe the trial court must convey to the jurors the knowledge that before they may convict a defendant of a criminal offense the evidence must be sufficient to convince them of the defendant's guilt and that the degree of conviction which they must have is a conscientious belief that the charge is almost certainly true.

## V. Instruction Regarding Abnormal Condition of Mind

At trial, both the defendant and the State produced expert opinion testimony on the issue of the defendant's criminal re-

sponsibility. The defendant requested the presiding Justice to instruct the jury not only on the question of criminal responsibility but also on the issue whether this and other evidence established a reasonable doubt as to the requisite culpable state of mind. *See, e. g., State v. Sommer*, Me., 409 A.2d 666, 668 (1979); *State v. Burnham*, Me., 406 A.2d 889, 895 (1979). The defendant's proposed instructions on the latter issue followed 17–A M.R.S.A. § 58(1–A) and advanced as a definition of "abnormal condition of mind" the statutory definition of "mental disease or defect" provided in 17–A M.R.S.A. § 58(2). The presiding Justice refused to give the requested instruction. He did, however, charge the jury both as to the insanity defense, 17–A M.R.S.A. § 58(1), and as to evidence of an abnormal condition of mind creating a reasonable doubt as to the existence of a culpable state of mind, 17–A M.R.S.A. § 58(1–A). He gave the Section 58(1–A) instruction on three separate occasions during his charge to the jury.

■ Having failed to object to the charge, the defendant, if he would prevail, must establish obvious error within the meaning of M.R.Crim.P. 52(b). It is the contention of the defendant that the presiding Justice's instructions relative to Section 58(1–A) were defective because they provided the jury with no definition of "abnormal condition of mind." The defendant erroneously contends that the statutory definition of "mental disease or defect," 17–A M.R.S.A. § 58(2), is also the definition of "abnormal condition of mind" within the meaning of Section 58(1–A). It is clear, however, that Section 58(2), which defines "mental disease or defect" for the purposes of the insanity provision, requires an abnormal condition of mind of a specific character–that which substantially affects cognitive or substantially impairs volitional processes. The existence of this specified type of mental abnormality may relieve a defendant of criminal responsibility and result in a verdict of not guilty by reason of insanity. Evidence of abnormal condition of mind, on the other hand, if it creates a reasonable doubt as to the existence of the requisite culpable state of mind will result

in an acquittal. *See State v. Burnham, supra*, 406 A.2d at 896. *See also State v. Lewisohn*, Me., 379 A.2d 1192, 1212 (1977). Thus, Section 58(2) has no application to Section 58(1–A). The Criminal Code does not undertake to define "abnormal condition of mind" because the phrase is one of common usage and understanding. *See State v. Lewisohn, supra*, 379 A.2d at 1212. When dealing with the issue raised by Section 58(1–A), the question is not the precise nature of the abnormality but whether the abnormality, whatever its character, raises a reasonable doubt as to whether the defendant possessed the requisite culpable state of mind for the particular offense charged. Unlike the insanity defense, where the legislature made a policy choice as to which abnormalities of the mind should be sufficient to relieve a defendant of criminal responsibility, Section 58(1–A) raises the question whether the State has proven beyond a reasonable doubt that the defendant committed a crime at all. The instructions of the presiding Justice appropriately and adequately focused the jury's attention on this latter issue.

## VI. Other Claims of Error

The defendant has raised numerous other claims of error including ineffective assistance of counsel at the trial. He concedes that on the basis of the record before this Court the claim of ineffective assistance of counsel is cognizable only by post–conviction relief and not on direct appeal. *See, e. g., State v. Dutremble*, Me., 392 A.2d 42, 45 n.5 (1978); *State v. Powers*, Me., 386 A.2d 721, 729 (1978). After a careful review of the record, we find none of the defendant's other claims of error to be worthy of discussion and conclude from our examination of the entire record that the defendant was afforded a fair trial at which no errors of law occurred.

The entry is:

Judgment affirmed.

All concurring.